Mr. Justice Cox
delivered the following opinion.
I gave notice, gentlémen, that I would, this morning, dispose of the motion for a new trial in the cause of Kilbourn vs. Thompson. This is one of those cases in which a jury is very liable to be carried away by impulse. I do not mean bad impulse, but, on the contrary, good and generous impulse, because in the direction of redressing wrong; but still one which, unless restrained, is apt to lead to excess; and it is, therefore, a case in which, I think, it is ordinarily the duty of the court to stand guard upon the jury and endeavor to keep them within reasonable limits. It was for this reason that, at the trial, I considered it my duty to charge the jury in such a way as to eliminate from the case the elements which dught not to be allowed to, but .which were very well calculated to disturb the judgment.
I have listened to the arguments on the motion for a new trial with a great deal of interest, and had an opportunity to consider somewhat more maturely the views that were enunciated in my charge, which were my first impressions formed without the aid of discussion.
Some criticism has been made upon the charge in two particulars ; first, upon that part of it which admonished the jury to discriminate between the act of the defendant, and the acts of the House of Representatives, or of its committees or members; second, upon that part which, in substance, advised the jury that they must deal with this case as peculiarly a case against the individual defendant, in which he alone was responsible for the injury complained of, without any legal recourse for indemnity against the United States.
The first instruction was really but a repetition of one which had already been gi ven in writing, at the instance of the defendant, and without objection on the part of the plaintiff. It is very difficult to keep the sins of the House of Representatives out of of this case. The very narrative of the whole transaction, in connection with the case, would give the jury the idea that they were somehow called upon to punish the House of Representatives. That position is *418 not taken by counsel, of course; but the whole sentiment of the argument was that the act of the defendant was only a part of the entire drama and was aggravated by the conduct of the House of Representatives, and by the very fact that they had commanded the arrest; and that the whole wrong complained of, from its very inception, ought to be visited upon the defendant. This was a line of argument that counsel would very naturally drift into, in view of the possible provision by law for an indemnity to the defendant for what he might have to pay. These considerations led to the instruction in the charge of which I am now speaking.
The wrong committed by the defendant was the arrest and imprisonment of the plaintiff without lawful authority. The actual injury resulting from this was entirely irrespective of the pretences or the show of authority with which the defendant acted. It would have been precisely the same whether he acted under a warrant from the speaker of the House of Representatives, or a capias from this court, or a commitment from the Police Court of this District. In each of the cases supposed be would be a tort feasor, if his warrant were unlawful; and not more so in one case than in either of the others. The question by what authority he acted is irrelevant to the issue of quantum damnifieatus, except for the purpose of the defence, in the way of mitigation or excuse. If the defendant can show that he acted without malice and in obedience to a supposed lawful authority, this may be used by him to avert exemplary damages, but how it can be used by the plaintiff* to swell the damages it is difficult to perceive. The more exalted the source of authority, the more probable cause the defendant would have for his conduct; but the notion I am speaking of would seem to reverse all this and find in it the greater aggravation.
The fact that the House of Representatives commanded the plaintiff’s arrest' cannot certainly make it a greater wi’ong on the part of the defendant than if he acted without such authority, but it may, on the contrary, palliate it, as Judge Taney said in Mitchell vs. Harmony, 13 Howard.
*419 The wrong of the superior who commands cannot be added to that Of the subordinate who obeys, so as to duplicate the latter’s offence and call for double satisfaction ; especially where, as in this case, the act of the superior is not an actionable wrong.
If the injurious act of the House in ordering the arrest is not to be considered as aggravating the defendant’s responsibility, still less must other action of the House in which he had no participation. Otherwise his simple obedience to the Speaker’s warrant would be held to relate back and make him partíceps criminis and joint tort-feasor in every slander uttered in debate, or other injurious act, of which plaintiff may complain ; all of which would, on common law principles, seem to be absurd. Neither does the act of Congress of March 3, 1875, chap. 130, sec. 8, give any countenance to the idea that wrongs committed by the House can be redressed in this action. That act adopts for, and makes applicable to, this kind of action, the provisions of former acts, the material part of which is embodied in section 989 of the Revised Statutes in the following words:
“ Sec. 989. When a recovery is had in any suit or proceeding against a collector or other officer of the revenue, for any act done by him, or for the recovery of any money exacted by or paid to him, and by him paid into the Treasury, in the performance of his official duty, and the court certifies that there was probable cause for the act done by the collector or other officer, or that he acted uuder the directiions of the Secretary of the Treasury, or other proper officer of the Government, no execution shall issue against such collector or other officer, but the amount so recovered shall, upon final judgment, be provided for and paid out of the proper appropriation from the Treasury.”
It may be safely assumed that Congress never intended, by this legislation to confer on the citizen the privilege of suiDg the United States for a tort. The right to sue the Government, even in contract, was” tardily and grudgingly bestowed when the Court of Claims was created, and then the litigation was commited to the arbitrament of a court *420 and not a jury. To suppose that a single section in an appropriation act was intended to work such a revolution in the policy of the Government as to allow a citizen to sue the United States, in any federal court, and recover damages for a tort, to be assessed by a jury, would be quite extravagant. And yet, if, in a suit like the present, against a subordinate officer, the supposed wrongs done by Congress, or either House, or its personally irresponsible members, by their official acts, can be considered by a jury, or be allowed to influence their assessment of damages, a verdict rendered under such influence, and increased in amount by it, would be a recovery of damages for a tort of the Government, or a branch of it; and if, by the law, a judgment on such verdict is intended to be assumed by the United States, such judgment is thereby made as complete a recovery of damages in tort, against the United States, as if the Government' were a party on the record.
Such a result was certainly never contemplated by Congress. They doubtless intended that in a case of probable cause, and, therefore, of compensation, and not punishment, a judgment against the individual officer, such as would be rendered without reference to any action of the superiors, the Government, should be assumed ; that is in a suit which should be essentially, as well as in form, a suit against the individual ; and, if so, then the fact that such judgments are provided for in the law is not relevant to the issue of damage, and ought not to be considered by the jury or allowed to influence them ; but they ought to deal with the case as if no such possibility existed. This ought to be the case, for the further reason, that the defendant has no certain recourse against the United States, but it not only depends on the disposition of Congress to make appropriations, but even, under the law, it is conditional upon the view which the court may take and certify as to the defendant’s conduct, in reference to the existence of probable cause for his action. These views are fortified by the case of Andrae vs. Redfield, 12 Blatchford, 416. That was a bill in equity brought to enjoin a collector from setting up the plea of *421 limitation to a number of actions against him for things done in the course of his official duty. It was urged on the part of the plaintiff that the plea was inequitable in view of the nature of the action, and especially with reference to the ultimate responsibility of the Government. The court says:
“ It is proper to add, in support of the view that the actions at law in question are in fact, as well as in form, actions against the defendant; that,if judgments be recovered thereon, they become liens upon his real estate and although, by a provision in the 12th section of the act of Congress of March 3, 1863, which is now found in section 989 Rev. Stats., it may, upon certain conditions, become the duty of the Secretary of the Treasury to pay the judgments, it cannot be now asserted in advance of .the trial, that such duty will become absolute. Suppose that such payment should not in fact be made. Can it be said that the defendant has no interest in the question of recovery or no recovery against him; and, especially, supposing that the court before which the trial may be held should not deem the case, as developed on the trial, one in which a certificate of probable cause ought to be granted, how then is the defendant to avoid the payment, protect his property from execution, or relieve his estate from the lien of the judgment ? We are not advised that there is anything in the Revised Statutes of the United States which makes these actions any less actions against the defendant; and sections 3009-3014, do not seem to us to change the nature of these actions or deprive the defendant of any defence which he would otherwise be entitled to.”
I, therefore, can see no error in the instructions I gave to the jury, not to consider any complaints against the House of Representatives, and to deal with the defendant as the sole party to respond for the wrong complained of in this suit, without any ultimate recourse for indemnity.
We come now to the facts of the case itself. There are three injuries complained of in this action, excluding what, under the law, I held to be excluded from consideration, *422 such as the claim for counsel fees, etc. First, the injury to the business of the plaintiff'. Second, the injury to his health. Third, the injury to his feelings.
I do not see how this verdict could have been founded, and I will not assume that it was founded, upon any evidence relating to the business of the plaintiff. The only evidence that we had on that subject was the testimony of the plaintiff himself, to the effect that he believed that the disposition manifested in Congress to investigate his affairs disaffected customers toward him, and estranged them from him, on account of the natural apprehension that their own business might be investigated if they should entrust it to him. This view was only an opinion which no facts could be given to sustain, and would not be evidence on which a jury could act. It certainly furnished no material for computation. And even if that opinion was well founded, it is to be observed that the mischief apprehended originated and ended in the House of Representatives and its committees, and it may be said to have been completed before this defendant came upon the scene at all. I am unable to see how he could, in the nature of things, have done any damage to the business of the plaintiff, except by taking him from his business and preventing him from giving his personal attention to it.
There is no evidence in the case at all tending to show, or offered for the purpose of showing, that his mere absence from his business had any evil effect upon it ; and it is hardly credible that even if it had been in a prosperous condition, still less in the condition which the testimony demonstrated it to have been in, that the temporary absence of the defendant when he had two partners, both competent business men, and had unrestricted intercourse with them, could have had the effect of destroying his business. I, therefore, assume that this part of the subject probably did not enter into' the computation of damages by the jury.
With regard to the sickness which may be said to be a factor in the claim, including medical expenses, there was some evidence. The evidence was that the plaintiff con *423 tracted a fever which lasted several months. This fever did not confine him to his bed, or, as I remember, even to his house, a great deal, and did not occasion any acute suffering, but simply general depression. It yielded in the course of time to treatment and the influence of travel and change of scene. There was some expense incurred, but it is very plain, I think, that no appreciable part of this verdict can be attributed to that.
It is not to be doubted, I think, that almost the entire verdict, and I think for all practical purposes we may say the entire verdict, was founded upon the supposed injury to the person and the outrage to the feelings of the plaintiff. This was the main theme of the argument and the ground upon which the strongest appeal was made to the jury. The question then is, whether the verdict is to be considered excessive, as claimed on the part of the defendant, or merely as adequate compensation for this kind of injury.
A difficulty undoubtedly presents itself here. The courts have held that injury to the feelings is the subject of compensatory and not vindictive damages only. The trouble arises- in the endeavor to draw the line between compensation and vindictiveness. There cannot be an injury to a man’s feelings without causing not only distress, but resentment also, and the difficulty here is to draw the line between alleviating the distress and gratifying the resentment, aud yet courts and juries are bound to draw this line according to the circumstances of each particular case.
On the subject of excess, a number of precedents have been cited on the part of the plaintiff'. We have been referred to the celebrated “General Warrant Oases,” as they are called, which arose in the years 1763-5-9. These were cases growing out of what would be universally considered very high-handed outrages. The Secretary of State in England, who was not clothed with a shadow of judicial authority, undertook to issue his warrant to seize and search the papers of various subjects upon suspicion ; and not • only *424 that, but issued his warrant to the king’s messengers, as they were called, who were not officers of the law at all, authorizing them to arrest certain parties who should by them be discovered to be guilty of certain offenses, that is, to be concerned in the publication of the North Briton, which was considered a seditious and libellous sheet. Under these warrants a number of printers were arrested, and, finally, Mi’. John Wilkes was arrested, and actually committed to th'e Tower. They brought suits against the king’s messengers and recovered damages against them ranging from £300 to £400. Then, again, suit was brought by Wilkes against the under Secretary of State, who had been quite officious in these proceedings, and damages were recovered against him to the extent of one thousand pounds. Finally, Wilkes brought his suit against Lord Halifax, the Secretary of State himself, and recovered damages to the extent of four thousand pounds, or twenty thousand dollars.
These verdicts were not based upon any assessment of the value of time, or the business affected by these transactions. They were essentially verdicts for exemplary damages, because the acts complained of were considered gross and outrageous wrongs. In one of the cases for which, I think, a verdict was given for either three or four hundred pounds, the Lord Chief Justice of the Common Pleas, said, upon a motion to set aside the verdict for excessive damages, that “ if the jury had been bound by their oath to consider the personal injury only, perhaps twenty pounds damages would have been sufficient. But the mere personal injury done to the plaintiff, or the inconsiderableness of his station and rank in life, did not appear to the jury in that prominent light in which it might have been presented. They saw only the majesty of the law invaded ; they saw only the exercise of arbitrary power in violation of Magna Charta, and an attempt at the liberty of the kingdom, by insisting upon the legality of the general warrant.” These were the ideas that struck the jury, and it was held that they were therefore justified in giving exemplary damages.
*425 The distinction between exemplary and compensatory damages was very imperfectly outlined in the jurisprudence of the common law of that date. It has been better ascertained and certainly more definitely stated since. On this subject I think it proper to refer to one or two cases in the Supreme Court.
In the case of Day vs. Woodworth et al., 13 Howard, 371, the court said:
“In actions of trespass, when the injury has been wanton and malicious, or gross and outrageous, courts permit juries to add to the measured compensation of the plaintiff which he would have been entitled to recover had the injury been inflicted without design or intention, something further by way of punishment or example; which has sometimes been called smart-money.”
In the case of the Philadelphia, Wilmington & Baltimore R. R. Co. vs. Quigley, 21 Howard, 213, which was an action for libel, in a published report, the court says:
“In Day vs. Woodworth, 13 Howard, 371, the court recognized the power of a jury in certain actions of tort to assess against the tort-feasor punitive or exemplary damages. Whenever the injury complained of has been inflicted maliciously or wantonly and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved party. But the malice spoken of in this rule is not merely the doing of an unlawful act. The word implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations.”
In the case of the Milwaukie & St. Paul R. R. Co. vs. Arms et al., 1 Otto, 91, which was an action for injury on the railroad, the court applies the rule before stated in Day vs. Woodworth, and says, that no exemplary damages ought to be allowed unless the injury be wilful or the result of reckless indifference to the rights of others.
In the last case on the subject to which I will refer the *426 question is still further considered. That is the case of Beckwith vs. Bean, in 98 United States.
That was a case where certain officers of the army during the war arrested a man named'Bean upon suspicion of defrauding the Government in the matter of bounties and procuring desertions. The court reversed the court below for not admitting evidence tending to show actual guilt, but which was not known at the time of the arrest. The court below had rejected that evidence upon the ground that it could not have entered into the question of the motive of the offending party. They say :
“This evidence tended to rebut the presumption of malice which might arise from the simple arrest and imprisonment, unaccompanied by any explanation of the reasons therefor. In connection with evidence which was admitted without objection, it seems to present a case which, under the law, did not call for or admit of vindictive or punitory damages against the plaintiffs in error.”
A little further on the court says :
“ If Captain Henry in good faith believed that Bean was guilty of such misconduct in the enlistment of the two deserters, it was his duty to communicate the facts and circumstances to his superior officers. If the order to Beck-with to arrest Bean was given by him in good faith, believing it to be his duty to obey the command of his superior officer, General Pitcher ; if Beckwith executed the order under a like belief, and in like good faith ; if the arrest was made and the imprisonment ordered from an honest purpose to guard the public interests and protect the army from the evil consequences of sham enlistments and frequent’ desertions—they were entitled, by every consideration of justice, to stand before the jury in a more favorable light upon the question of damages than they would or should have stood had they been actuated by ill-will or sought to oppress one whose conduct had not justified the conclusion that he had violated the law. Every fact, therefore, which served to illustrate the motives which governed the plaintiff in error in committing the trespasses complained of, *427 and every fact which fairly conduced to prove the existence or non-existence of just grounds for imputing to Bean the fraudulent and illegal acts charged against him, and which were assigned as the cause of his arrest, were competent evidence, not in justification, but in mitigation of damages. It is the settled doctrine that ‘ damages are graduated by the intent of the party committing the wrong.’ It is equally well settled that in the absence of gross fraud, malice or oppression, in cases of trespass to person or estate, the jury should restrict damages to compensation or satisfaction for the actual injuries sustained.”
Further on, the court adopts the language of the Supreme Court of Ohio in the case of Slimpson vs. McCaffrey, 13 Ohio, 508, as follows:
“The principle of permitting damages in certain cases to go beyond naked compensation, is for example, and the punishment of the guilty party for the wicked, corrupt, and malignant motive and design which prompted him to the wrongful act. A trespass may be committed from a mistaken notion of power, and from an honest motive to accomplish some good end. But the law tolerates no such abuse of power nor excuses such act; yet, in morals and the \iye of the law, there is a vast difference between the criminality of a person acting mistakenly from a worthy motive, and one committing the same act from a wanton and malignant spirit, and with a corrupt and wicked design. Hence, where a jury are called upon to give smart-money or damages, beyond compensation, to punish the party guilty of the wrongful act, any evidence which would show this difference, or rather all the facts and circumstances which tend to explain or disclose the motives and design of the party committing the wrongful act, are evidence which should go to the jury for their due consideration.”
In the light of these authorities, I think that I make no mistake in the definition of the distinction between exemplary and compensatory damages, and in giving instructions to the jury in such terms that in view of the facts tacitly, if not expressly conceded in the case, they could not, with *428 out disregarding both law and evidence, render a verdict for examplary damages. If they did mean to do so, I should think it would be sufficient ground for setting aside the verdict.
I will assume, however, that the verdict was intended to be compensatory only, and will discuss the question in that aspect.
I have no guide upon this question except judicial experience and such common sense as has been vouchsafed to me. I cannot form an estimate of the proper rule of damages in this case, except by comparing it with others, and from the point of view that the trespass complained of here must be treated, without reference to the source of authority under which it was committed. Suppose, for instance, that the plaintiff had been arrested by a marshal of this court, under a void process, and put into jail. The question is, whether, in such a case a verdict of this description, as satisfaction for wounded feelings and compensation for the indignity to the person, is reasonable or excessive.
A number of cases have been referred to on the part of the defence, in this connection, which are more or less like the present case. In the first place, there are some actions for malicious prosecution or false arrest upon unfounded charges. The case of Wiggin vs. Coffin, 3 Story, has been referred to. That was an action for malicious prosecution for conspiracy, in which it appeared that the plaintiff had been carried two hundred and fifty miles from his home, had been kept under arrest eighteeu days, and had been brought four times before a court. The court found that there was no probable cause, so that it was a plain case for vindictive damages ; yet a verdict for $1,500 was set aside as excessive.
The case of Rauk vs. McGregor, 32 N. J. L., was an action for arrest on a charge of larceny. The verdict was for $3,000 and it was set aside.
The case of Walker vs. Martin, 43 Ill., 508, was an action brought for malicious prosecution on a charge of larceny. The plaintiff was in prison twenty-one days, and the evi *429 dence showed malice and no probable cause, as the court thought. There, a verdict of twenty thousand dollai’s was set aside.
In the case of Brown vs. Chadsey, 39 Barb., 293, the action was for arrest by a police officer upon mere information. The arrest was entirely groundless and a verdict was rendered for $2,000, which was set aside.
These cases are not exactly like the present case. They did not involve any infringement of a fundamental, constitutional right of a citizen. They were cases of arrest and false imprisonment on charges which, if they had been sustained, would have apparently justified the arrest. The grievance in these cases was in making false charges, but yet they are pertinent on the question of satisfaction or compensation for wounded feelings. There is no sort of comparison between the amount of suffering a man must experience in being arrested on a charge of disgraceful crime and being arrested for contempt of court, or any other authority. Frequently people would sympathize with a man in his contempt of court or other authority. Certainly no such arrest involves the least imputation on the honor or integrity or credit of the party arrested.
But the class of cases most akin to the present are those of arrests made by military authority during war, without any warrant of law. The history of the country has undoubtedly abounded with cases of this sort, and the outrages upon personal liberty have been just as great as in any case. I do not believe that many of those cases have found their way into the law books. I have been referred to two or three. One is a case that occurred in 1814, during the war with Great Britain—McConnell vs. Hampton, reported in 12 Johnson, 234. The plaintiff in that case was arrested on a charge of treason, upon suspicion, was confined for five days and was compelled to work. He obtained a verdict for $9,000, and that was set aside as excessive.
During the late civil war, a man named McCall was arrested by General McDowell. The case is found in 1 Deady, 233. He was arrested on suspicion, was confined *430 with the prisoners, and was compelled to work with them in the gang. I forget what length of time he was confined, but it was for a considerable time. The damages were assessed by the court, and he wa^ allowed ten dollars per day for the loss of time, and three hundred dollars as compensation for the indignity.
But the most conspicuous of the cases is that of Beckwith vs. Bean, to which I have already referred. I say, most conspicuous, because it came to the Supreme Court, and it is well to look at that ease as stated by Mr. Justice Field, who dissented. I will read from page 285:
“ It appears from the uncontradicted evidence in the record that on the 11th of November, 1864, whilst returning from a trip to Boston to his home in the province of Quebec, he was arrested in a passenger car near Wells river, in the State of Vermont, by the defendant Beckwith, without any warrant or process of law, and taken to Beckwith’s residence, in Sutton, in that State ; that he was detained there during the night under the charge of keepers; that his father, who lived at the distance of about fifteen miles, and for whom he had sent, arrived during the night, but that Beckwith refused to allow them to have an interview, except in his presence; that on the following day he was forcibly taken, by order of the defendant Henry, and placed in the State’s prison at Windsor, where he remained until the 26th of April, 1865, a period of nearly six months, when he was admitted to bail and released from imprisonment; that during this period he w7as locked up at night, and for the first few days, in the day time also, in a narrow and scantily furnished cell, being one in which convicts were confined at night; that after the first few days he was allowed, upon his complaint of the coldness of the cell, to spend the day in the shops where the convicts woi'ked, but he was required to go out and to return when they did, and at no time to be out of sight of a keeper, and not to go on the corridors or in the yard for exercise; that the food offered him was the fare served to convicts, which he could not eat, and that after-wards he obtained his meals from the keeper’s table by *431 paying a small sum each week; and that, during this period, no complaint against him was filed with any magistrate; he was held simply upon the order of the defendants.”
* * * * *
“ The record also shows that the plaintiff, throughout his imprisonment, made constant efforts in various ways to obtain a trial or a release on bail, which he was able and willing to furnish; and that eleven journeys were made by his father from the northern part of Vermont to Windsor and Brattleboro for that purpose. Among other efforts, the plaintiff appealed by letter to General Dix, the commander of the department, to order him to be brought to trial and to give him an opportunity to prove his innocence. But no trial was allowed him—that right which belongs or ought to belong to every one, even the humblest in the land, was denied to him—a born citizen of the United States. * * *
“ To add to the enormity of this case, the district attorney of the United States for Vermont states, in his testimony, that there were many other cases in his district, during the war, of persons charged with inciting or assisting soldiers to desert, and that they were all turned over to him to be prosecuted, and that they were prosecuted by him in the civil courts; but that he knew nothing of this case until April, 1865, and that soon afterward the plaintiff" was released on bail.”
In that case the verdict was $15,000, and that is the highest verdict which has been brought to my attention.
It is, perhaps, just as well to institute a comparison between the circumstances of that case and this. The confinement of Bean, as will be seen from a perusal of the facts, was a very grievous one. He was confined with convicts, offered only prison fare, and denied every comfort. The arrest of the plaintiff" in this case was scarcely more than a friendly invitation. Certainly, there were no circumstances of humiliation or degradation about his imprisonment. In the Beckwith and Bean case the plaintiff recovered only $15,000 for nearly six months’ imprisonment. In the present case there was a verdict of $60,000 for thirty-five days’ imprison *432 ment. In other words, if an equation of time and amount be stated, it will be seen that the plaintiff' in this case recovered twenty times more than the plaintiff in the Bean case, and that case is the most considerable one which has been brought to my attention.
It must be apparent, then, that this verdict, as regards the amount, is certainly without precedent. It may be said that the case is without precedent; but that, I think, is entirely a mistake. The action of the House of Representatives was , hardly precedented, but Congress is not being tried in this case. The act of the defendant had many precedents. It is difficult to resist the impression that the jury in this.ease thought they were inflicting punishment upon, or making an example of, the House of Representatives. If they could do it, I am not prepared to say that the verdict in the first trial would be one cent too much. But that cannot be discussed in this case. In the light of all the precedents, I cannot resist the conviction that the verdict in this case was excessive. I come to this conclusion with the greatest reluctance. I hoped at the outset that the verdict would be one which could be sustained, and had it been rendered for any amount from $10,000 to $20,000, or perhaps more, although doubtless most courts would have considered that extravagant, I should not have interfered with it. Under the circumstances, I deem it to be my imperative duty to set the verdict aside, and award a new trial.
Note.—This case was retried at a subsequent term of the court. The facts introduced in evidence were about the same as in the former trial. A verdict was rendered for $37.-500. On a motion to set aside the verdict as excessive, the court ordered the plaintiff' to file a remittitur of $17,500, or stand a new trial. The remittitur was accordingly entered.