UNITED STATES v. JOSEPHSON.
No. 91, Docket 20790.

Circuit Court of Appeals, Second Circuit.
Dec. 9, 1947.

Writ of Certiorari Denied Feb. 16, 1948.
See 68 S.Ct. 609.

Barent Ten Eyck, of New York City (Samuel A. Neuburger, of New York City, of Counsel; Gordon Grand, Jr., of New York City, on the brief), for defendant-appellant.

John F. X. McGohey, U. S. Atty., of New York City (Bruno Schachner, Samuel Rudykoff, Asst. U. S. Attys., both of New York City, of counsel), for appellee.

Arthur G. Silverman, of Washington, D. C., for Constitutional Liberties Committee of the National Lawyers Guild, amicus curiae.

Rogge, Fabricant, Gordon & Goldman, Wolf, Popper, Ross & Wolf and Osmond K. Fraenkel, all of New York City (Herbert J. Fabricant, Robert H. Goldman, Murray A. Gordon and Lester M. Levin, all of New York City, on the brief), for Joint Anti-Fascist Refugee Committee, amicus curiae.

Before SWAN, CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The appellant was found guilty by a jury after a trial in the District Court on an indictment reading as follows:

"(1) Pursuant to Public Law 601, 79th Congress, 60 Stat. 812, and House Resolution 5, 80th Congress, dated January 3, 1947, including the Rules of Congress therein adopted and amended, the House of Representatives was empowered to and did create the Committee on Un-American Activities, having duties and powers as set forth in said Resolution.

"(2) On the 5th day of March, 1947, at the Southern District of New York, Leon Josephson was summoned as a witness, by authority of the House of Representatives through its Sub-Committee of the Committee on Un-American Activities, to be sworn

CLARK, Circuit Judge, dissenting.

and to testify before the said Sub-Committee on matters of inquiry committed to said Committee.

"(3) Leon Josephson did appear before the said Sub-Committee, pursuant to subpoena served upon him, at its session in the Federal Court Building, Southern District of New York, on March 5, 1947, but then and there refused to be sworn and to give any testimony before said Committee (Title 2, United States Code, Section 192)."

The above named statute under which he was indicted provides in so far as presently pertinent that: "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, * * * or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, * * *." Rev. Stat. § 102, as amended, 52 Stat. 942, 2 U.S.C.A. § 192.

The Committee on Un-American Activities has been duly authorized under the Legislative Reorganization Act of 1946 to conduct investigations "of (i) the extent, character, and objects of un-American propaganda activities in the United States, (ii) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (iii) all other questions in relation thereto that would aid Congress in any necessary remedial legislation." 60 Stat. 812, 828. The provisions of this statute were incorporated in the rules of the House of Representatives of the Eightieth Congress by House Resolution 5, January 3, 1947.

After motions to set aside the verdict and in arrest of judgment had been denied, sentence was imposed and the appeal is from the final judgment. The appellant raises questions as to the sufficiency of the indictment; the sufficiency of the proof to support the verdict; the trial court's instructions to the jury; and the constitutionality of the law authorizing the committee to investigate. He is joined on the last point by two amici who have filed briefs by leave of court.

The above quoted indictment conforms to the requirements of Rule 7(c), Federal Rules of Criminal Procedure, 18 U.S.C.A. following section 687, 327 U.S. 821, 839, and was rightly held sufficient. Indeed, it is a good example of "a plain, concise and definite written statement of the essential facts constituting the offense charged." It enabled the appellant to understand the nature of the accusation, gave him the needed information to prepare his defense, and made it possible for him to plead the judgment in bar of another prosecution for the same offense should occasion for doing so arise. That, as we have often held, is enough to make an indictment good. United States v. Fried, 2 Cir., 149 F.2d 1011, certiorari denied, 326 U.S. 756, 66 S.Ct. 97, 90 L.Ed. 454; United States v. Wodiska, 2 Cir., 147 F.2d 38; United States v. Achtner, 2 Cir., 144 F.2d 49.

The statute, 2 U.S.C.A. § 192, embraces two offenses. See United States v. Murdock, 290 U.S. 389, 397, 54 S.Ct. 223, 78 L.Ed. 381. The first consists of the willful default of one who has been summoned as a witness. This offense, obviously, may be committed by willfully refraining, without adequate excuse, from appearing in response to a lawful summons and it may also be committed by appearing and then willfully terminating attendance before being excused. Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352, certiorari denied 303 U.S. 664, 58 S.Ct. 830, 82 L.Ed. 1121. Perhaps whatever is the equivalent of an unexcused withdrawal may, if done willfully, be a termination of attendance and a violation of this part of the statute. As willfulness was not charged in the indictment, the trial judge correctly held that the appellant was not on trial for a default in appearance or in attendance. It is argued, however, that, if guilty at all, he is guilty of a willful default and that it was error to hold that he was properly indicted for a violation of the second branch of the statute. The second branch makes

refusal to answer a question pertinent to the question under inquiry a misdemeanor but does not include "willfulness," however it may be defined, as an element of the offense. See United States v. Murdock, supra, 290 U.S. at 397, 54 S.Ct. 223, 78 L.Ed. 381. The answer to this contention is that, though a refusal to answer proved to be willful may be sufficient to support a conviction on an indictment for a default, Townsend v. United States, supra, it does not follow that the same refusal to answer may not be prosecuted under the second branch of the statute. That is to say, a refusal to answer any question pertinent to any matter under inquiry is a violation of the second branch of the statute as much when the refusal is "willful" as when it is not.

■■■ The indictment being sufficient and properly based upon the second branch of the statute, the next issue is whether there was enough evidence to support the verdict. In this connection it is to be noted, and the appellant rightly concedes, that at least as regards the second branch of the statute whether or not his appearance before the sub-committee was in response to a lawful subpoena lawfully served is immaterial. The language of the Supreme Court is even broader: "Section 102 [of the Revised Statutes, now 2 U.S.C.A. sec. 192] plainly extends to a case where a person voluntarily appears as a witness without being summoned as well as to the case of one required to attend." Sinclair v. United States, 279 U.S. 263, 291, 49 S.Ct. 268, 271, 73 L.Ed. 692.[1] The evidence was ample for the jury to find with the requisite certainty that the appellant appeared before the sub-committee and refused to be sworn or to testify. He was called as a witness by the chairman of the sub-committee and then and there refused to be sworn and, when asked upon what ground, stated, "I wish to raise the question of the constitutionality of this committee, and I propose to take the case through the courts to the United States Supreme Court if necessary." He was then asked by Mr. Stripling, the chief investigator for the committee, to stand and be sworn and again refused, saying that he contested "the right, the legality of this committee, to examine me." After the appellant's attorney had been identified and heard and had submitted a written statement, and Mr. Stripling had called attention to the situation regarding the issuance of subpoenas and their service upon the appellant, the following occurred:

"The Chairman: Mr. Josephson, will you stand and be sworn? Mr. Josephson: I will not be sworn.

"Mr. Stripling: Will you stand? Mr. Josephson: I will stand.

(Mr. Josephson stands.)

"Mr. Stripling: Do you refuse to be sworn? Mr. Josephson: I refuse to be sworn.

"Mr. Stripling: You refuse to give testimony before this sub-committee? Mr. Josephson: Until I have had an opportunity to determine through the courts the legality of this committee.

"The Chairman: You refuse to be sworn, and you refuse to give testimony before this committee at this hearing today? Mr. Josephson: Yes."

The appellant was then excused subject to call either by the sub-committee or the full committee.

The appearance and the refusal of the appellant to testify before the sub-committee thus being shown, the jury had evidence from which it could find, as its verdict shows it did, that the appellant refused to answer any question pertinent to the question under inquiry before the sub-committee. It is obvious that the unqualified refusal then and there to testify was tantamount to a refusal to answer any questions at all relating to the matter being investigated. After what had transpired, as shown above, the propounding of one or more specific questions would have been both futile and time-wasting and appellant's renewed or repeated refusal to answer them would have added nothing. He had made it crystal clear that

---

[1] The part of the indictment that charged the appellant with having been "summoned as a witness" and appearing "pursuant to subpoena" may be regarded as surplusage. Thus the trial court did not err in failing to submit the question of service to the jury.

he was determined not to answer any questions concerning the subject matter under investigation. Any argument to the effect that it was not shown that he refused to reply to any such questions can only be regarded, therefore, as wholly specious. The prosecution met, then, the requirement of Sinclair v. United States, supra, at pages 296, 297 of 279 U.S., at page 273 of 49 S.Ct., that it "plead and show that the question pertained to some matter under investigation" by pleading and showing that the appellant refused to answer any and all pertinent questions.

The appellant makes some contention to the effect that there was a question of fact as to whether he "had refused to give any testimony at all, irrespective of being sworn, or had merely refused to give sworn testimony, never having been intelligibly invited to give unsworn testimony," and that this "question" was never properly submitted to the jury. Section 192, his argument runs, does not make it a crime to refuse to be sworn, and this committee in fact, as he states he can show if permitted to do so, has taken unsworn testimony. The evidence which we have in part recited above plainly shows, however, that the appellant refused both to be sworn and, as a separate and distinct matter, to give any testimony "until I have had an opportunity to determine through the courts the legality of this committee." Consequently this so-called issue of fact is illusory at best and we need not decide whether a refusal to be sworn would alone have violated the statute.

■■■ The appellant further claims that he was prejudiced by the trial judge's refusal to instruct the jury "that no evidence has been adduced to show that any matter was under inquiry before the sub-committee on March 5, 1947." This refusal was without error. The trial court properly took judicial notice of the Legislative Reorganization Act of 1946, 60 Stat. 812,

828, setting forth the duties and powers of the Committee on Un-American Activities. A copy of House Resolution 5, January 3, 1947, incorporating that Act into the rules of the House of Representatives of the Eightieth Congress, was admitted in evidence without objection. This was sufficient evidence that some matter was under inquiry before the sub-committee and that is enough to meet this broad objection.

All prior questions having been decided against the appellant, we have next to determine what issues as to the constitutionality of the authorizing statute and resolution he can raise, and then to pass upon those. The appellant's arguments are several and will be considered in turn.

■■■ He first claims that, since Section 192 does not in and of itself provide an explicit guide to conduct, i. e., set forth what questions are pertinent to the matter under inquiry, but requires reference to the authorizing act, the latter is for purposes of this case a penal statute. Cf. M. Kraus & Bros., Inc. v. United States, 327 U.S. 614, 621, 622, 66 S.Ct. 705, 90 L.Ed. 894. He then argues that, if this be true, the statute is so vague and indefinite as to be unconstitutional, relying upon Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888; Herndon v. Lowry, 301 U.S. 242, 261, 57 S.Ct. 732, 81 L.Ed. 1066; and other similar cases. But this point is not available to the appellant. By refusing to testify at all he refused to answer any questions that were pertinent as well as those that were not and thus he was not put to the decision he argues could not have been made, viz., whether or not any particular question was pertinent. We may, therefore, put aside his contention that the language of the authorizing statute is so vague that a witness before the committee has no criteria to indicate in doubtful cases what questions asked would have the requisite pertinence.[2] Here it is enough to say, and the appellant as much as concedes,

[2] But see Mr. Justice Holmes' oft-quoted statement in Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232, that: " * * * the law is full of instances where a man's fate depends on his estimating rightly, that is, as a jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death." See also Holmes, J., in United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 74 L.Ed. 508.

that some questions could and perhaps would have been put that were pertinent to the inquiry, no matter how vague were these criteria. At the very least the language of the authorizing statute permits investigating the advocacy of the idea that the Government or the Constitutional system of the United States should be overthrown by force, rather than modified by the peaceful process of amendment of the Constitution set forth in Article V. The vice of vagueness in that language, if any, lies in the possibility that it may authorize, though we do not decide that it does so, investigations relating to the advocacy of peaceful changes. The appellant could, for example, have been asked whether he knew of propaganda activities designed to bring about the immediate destruction of the Government by violence and the question, as he clearly would have known, would have been pertinent. Having refused to answer any questions whatsoever, he cannot now claim that the authorizing statute is invalid merely because it did not furnish him with criteria that were sufficiently definite to permit him to determine the pertinency of some question that might never have been asked him.

It is next seriously argued that any investigation made by the committee as now authorized would necessarily have as its subject the "private affairs of private citizens" and it is pointed out that in the only case [3] in which the Supreme Court has passed on a resolution empowering that kind of an investigation the resolution was held invalid. Whether that case should now be treated as barring an investigation because private affairs may be made public is open to question.[4] This, however, we need not decide. It is sufficient to say that the subject of the Committee's investigations was, as the statute and resolution show, the extent, character, and objects of propaganda activities in this country which were designated Un-American; the diffusion within this country of subversive and Un-American propaganda which attacks the principle of the form of government that is guaranteed by the Constitution; and all related questions that would aid Congress in any remedial legislation. This subject was sufficiently broad in scope so that the information sought to be gained for the use of the Congress would be comprehensive and adequate, but was nevertheless confined to certain types of propaganda about the potency of which there can be little doubt. If such propaganda takes the form of, for example, advocacy of the overthrow of the Government by violence, it is rightfully called "Un-American" and a sensible regard for the self-preservation of the nation may well require its investigation, with a view to the enactment of whatever remedial legislation may be needed or to the amendment thereof.[5] One need only recall the activities of the so-called fifth columns in various countries both before and during the late war to realize that the United States should be alert to discover and deal with the seeds of revolution within itself. And if there be any doubts on the score

[3] Kilbourn v. Thompson, 103 U.S. 168, 26 L.Ed. 377; see also Sinclair v. United States, supra, 279 U.S. 263 at pages 292–294, 49 S.Ct. 268, 73 L.Ed. 692.

[4] See Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv.L.Rev. 153, 219: "Kilbourn v. Thompson also resurrects the argument made by John Quincy Adams in 1834 that the non-official conduct of a citizen is immune from Congressional scrutiny. Some quality akin to the 'right of privacy' seems to attach itself as a penumbra to this conduct, sheltering it from the probing inquiries of Congressional committees. Established privileges of immunity, of course, exist before such committees as well as before courts of law. But the mere fact that by a subpoena duces tecum a court is subjecting to the public gaze the private affairs or private business of a citizen has never been suggested as a bar to the court's process."

[5] It is to be noted that the Subversive Activities Statute, 54 Stat. 670, 18 U.S. C.A. §§ 9–13, makes it a crime, among other things, "to knowingly or willfully advocate * * * overthrowing or destroying any government in the United States by force or violence, or by the assassination of any officer of any such government; * * *." The constitutionality of this statute has been upheld in Dunne v. United States, 8 Cir., 138 F. 2d 137, certiorari denied, 320 U.S. 790, 64 S.Ct. 205, 88 L.Ed. 476, rehearing denied, 320 U.S. 814, 64 S.Ct. 260, 88 L. Ed. 492.

of the power and duty of the Government and Congress to do so; they may be resolved when it is remembered that one of the very purposes of the Constitution itself was to protect the country against danger from within as well as from without. See The Federalist, Nos. II-X.[6] Surely, matters which potentially affect the very survival of our Government are by no means the purely personal concern of any one. And investigations into such matters are inquiries relating to the personal affairs of private individuals only to the extent that those individuals are a part of the Government as a whole. The doctrine of Kilbourn v. Thompson, supra, is, then, not here involved. Sinclair v. United States, supra, 279 U.S. at page 294, 49 S.Ct. at page 272.

▮ The appellant contends, however, that this committee's investigations are made not for any legislative or remedial purposes, but only in order to "expose the political beliefs and affiliations of individuals and groups." We are told that these inquiries are "an imposition upon the individual or group investigated" and that "notoriety is an effective method of silencing and discrediting a political opponent." In contrast to this, however, may be compared the recently published Report of the President's Committee on Civil Rights (Government Printing Office 1947) where it is stated that "The principle of disclosure is, we believe, the appropriate way to deal with those who would subvert our democracy by revolution or by encouraging disunity and destroying the civil rights of some groups (P. 52)." It is pointed out that "In the political realm, the Federal Communications Commission, the Post Office Department, the Clerk of the House of Representatives, and the Secretary of the Senate—all of these under various statutes —are required to collect information about those who attempt to influence public opinion (Pp. 52-53)."[7] And, indeed, one of the committee's several recommendations to strengthen civil liberties is "The enactment by Congress and the state legislatures of legislation requiring all groups, which attempt to influence public opinion, to disclose the pertinent facts about themselves through systematic registration procedures (P. 164)." But we have no occasion now to decide whether a Congressional investigation may have exposure as its principal goal or when, if ever, a statute may.[8] It is sufficient to say that the authorizing statute contains the declaration of Congress that the information sought is for a legislative purpose and that fact is thus established for us, Barry v. United States ex rel. Cunningham, 279 U.S. 597, 619, 49 S. Ct. 452, 73 L.Ed. 867; McGrain v. Daugherty, 273 U.S. 135, 176-180, 47 S.Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1, regardless of any statement by the Committee or its members intimating the contrary. The fact that there may be "exposure" incidental to the inquiry goes only to the question of freedom of speech, which we discuss below.

▮ It is, of course, well settled that Congress may make investigations in aid of legislation. E.g., McGrain v. Daugherty, 273 U.S. 135, 174, 47 S.Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1; United States v. Norris, 300 U.S. 564, 573, 57 S.Ct. 535, 81 L.Ed. 808. And it is immaterial that in the past this particular committee has proposed but little legislation. Townsend v. United States, supra, 68 App.D.C. at page 226,

---

6 E.g., No. II (John Jay): "Among the many objects to which a wise and free people find it necessary to direct their attention, that of providing for their *safety* seems to be the first. * * * "

7 The Report further says: "The ultimate responsibility for countering totalitarians of all kinds, rests, as always, with the mass of good democratic Americans, their organizations and their leaders. The federal government must set an example of careful adherence to the highest standards in guaranteeing freedom of opinion and expression to its employees. Beyond that it ought to provide a source of reference where private citizens and groups may find accurate information about the activities, sponsorship, and background of those who are active in the market place of public opinion (P. 53).

8 But cf. Lewis Publishing Co. v. Morgan, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190 (upholding 37 Stat. 553, 554, 39 U.S.C.A. § 233, which required that applicants for second-class mailing privileges file sworn statements setting forth the names and addresses of their editors, publishers, stockholders, etc.).

95 F.2d at page 355. Information gained by a committee of this nature, provided its search for the truth may not be frustrated by such obstructive tactics as those employed by the appellant, might well aid Congress in performing its legislative duties, viz., in deciding that the public welfare required the passage of new statutes or changes in existing ones or that it did not. Cf. Landis, supra, at pages 208-10. Some of these duties are imposed not only by the principle that the Government shall preserve itself, but, of course, by express provisions in the Constitution. Thus among the purposes of the Constitution, as expressed in the Preamble, are to "insure domestic Tranquility," to "provide for the common defense," to "promote the general welfare," and to "secure the Blessings of Liberty." Art. 1, sec. 8 gives Congress the power to "provide for the common Defense," "to raise and support Armies," "to provide and maintain a Navy," "to make Rules for the Government and Regulation of the land and naval Forces," and to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." Art. IV, Sec. 4 provides that "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion" and on application "against domestic Violence." More specifically, as Judge Holtzoff said in United States v. Bryan, D.D.C., 72 F. Supp. 58, 62: "That the subject of un-American and subversive activities is within the investigating power of the Congress is obvious. Conceivably, information in this field may aid the Congress in legislating concerning any one of many matters, such as correspondence with foreign governments (U.S.C.A. Title 18, § 5); seditious conspiracy (Id. § 6); prohibition of undermining the morale of the armed forces (Id. § 9); suppression of advocacy of overthrow of the Government (Id. § 10); the registration of organizations carrying on certain types of propaganda (Id. §§ 14 and 15); qualifications for entering and remaining in Government service; the authorization of Governmental radio broadcasts to foreign countries; and other innumerable topics. Similarly such information may be helpful in appropriating funds." Though this list is ample for our purposes, it may be added that newspapers and other periodicals must file and publish statements showing their management and ownership to obtain second-class mailing privileges, 39 U.S.C.A. § 233; and foreign agents must register with the Attorney General if they engage in political activity, 22 U.S.C.A. §§ 601, 611 et seq.

■ Despite all this it is argued in behalf of this appellant that the First Amendment forbids the gathering of information by a duly authorized Congressional committee or its sub-committee regarding propaganda activities. If this be true, the Constitution itself provides immunity from discovery and lawful restraint for those who would destroy it. The theory seems to be that the investigation of Un-American or subversive propaganda impairs in some way not entirely clear the freedom of expression guaranteed by the Bill of Rights.

It may be doubtful whether this appellant can raise the issue without more to show that the free exercise of his rights has been impaired in some way. And the statute not purporting to license the dissemination of ideas, the case seems unlike Thornhill's, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, and it perhaps would not be difficult for us to rest our decision on the ground that the appellant has no standing to challenge the statute on its face. We shall resolve this doubt in favor of the appellant, however, in order to give him the full benefit of being able to contest this exceedingly important point.

The argument of the appellant and the amici is in substance that the Committee's power to investigate is limited by Congress' power to legislate; Congress is prohibited from legislating upon matters of thought, speech, or opinion; ergo, a statute empowering a Congressional committee to investigate such matters is unconstitutional. The mere statement of this syllogism is sufficient to refute it. Congress obviously can use information gathered by this Committee to pass legislation not encroaching upon civil liberties, as above noted. The appellant's argument necessarily, therefore, is

reduced to the absurd proposition that because the facts resulting from the Committee's investigations conceivably may also be utilized as the basis for legislation impairing freedom of expression, the statute authorizing such investigations must be held void. But clearly Congress can and should legislate to curtail this freedom [9] at least where there is a "clear and present danger" that its exercise would, as by armed rebellion or external attack, imperil the country and its Constitutional system, including, until amended, the peaceful process of amendment. Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470. Such legislation might ultimately be the only means for the preservation of this freedom. To draw again from the Report of the President's Committee on Civil Rights, "The most immediate threat to the right to freedom of opinion and expression" consists of two groups, the Communists and Fascists, both of which "often use the words and symbols of democracy to mask their totalitarian tactics. But their concern for civil rights is always limited to themselves. Both are willing to lie about their political views when it is convenient. They feel no obligation to come before the public openly and say who they are and what they really want (P. 48)." [10] At the same time, as yet Congress has not determined that there is such a clear and present danger from these groups that their freedom to attempt to influence the public to adopt their views should be abridged,[11] and until Congress validly does so, if ever, that freedom should be zealously guarded. But surely this does not mean that Congress cannot collect facts that would enable it to ascertain whether such a danger exists from these quarters or any others.

The appellant's argument runs counter to the very purpose of the First Amendment. The power of Congress to gather facts of the most intense public concern, such as these, is not diminished by the unchallenged right of individuals to speak their minds within lawful limits. When speech, or propaganda, or whatever it may at the moment be called, clearly presents an immediate danger to national security, the protection of the First Amendment ceases. Congress can then legislate. In deciding what to do, however, it may necessarily be confronted with the difficult and complex task of determining how far it can go before it transgresses the boundaries established by the Constitution. What has elsewhere been said is equally applicable here: "The power of Congress to exercise control over a real estate pool is not a matter for abstract speculation but one to be determined only after an exhaustive examination of the problem. Relationships, and not their probabilities, determine the extent of Congressional power. Constitutionality depends upon such disclosures. Their presence, whether determinative of legislative or judicial power, cannot be relegated to guesswork." Landis, supra at page 217. Needless to say, this statement is all the more apt where the subject about which Congress is contemplating legislation is not abuse of power by a particular monopoly but at least partially concerns the delicate matter of free speech.

And it may be added, it is not for the courts to assume in advance that Con-

---

[9] And indeed has legislated. E.g., the Espionage Act of 1917, 40 Stat. 217, 50 U.S.C.A. §§ 31–42. The constitutionality of this act was upheld in Frohwerk v. United States, 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561; Debs v. United States, 249 U.S. 211, 39 S.Ct. 252, 63 L.Ed. 566; Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; Pierce v. United States, 252 U.S. 239, 40 S.Ct. 205, 64 L.Ed. 542; Heynacher v. United States, 8 Cir., 257 F. 61, certiorari denied 250 U.S. 674, 40 S.Ct. 54, 63 L.Ed. 1201; Dodge v. United States, 2 Cir., 258 F. 300, 7 A.L.R. 1510, certiorari denied 250 U.S. 660, 40 S.Ct. 10, 63 L.Ed. 1194; Equi v. United States, 9 Cir., 261 F. 53, certiorari denied 251 U.S. 560, 40 S.Ct. 219, 64 L.Ed. 414. See also the Subversive Activities Act, 54 Stat. 670, 18 U.S.C.A. §§ 9–13, upheld in Dunne v. United States, 8 Cir., 138 F.2d 137, certiorari denied 320 U.S. 790, 64 S.Ct. 205, 88 L.Ed. 476, rehearing denied 320 U.S. 814, 64 S.Ct. 260, 88 L.Ed. 492.

[10] See also Dunne v. United States, supra, 138 F.2d at pages 143, 144.

[11] Except to the extent that they or their members may violate 54 Stat. 670, 18 U.S.C.A. §§ 9–13.

gress will pass any legislation in violation of the First Amendment. We are told that there is no presumption of constitutionality where civil liberties are concerned. See, e. g., Thomas v. Collins, 323 U.S. 516, 529, 530, 65 S.Ct. 315, 89 L.Ed. 430; Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L. Ed. 155; Note, 40 Col.L.Rev. 531. But though this may well be true as regards already enacted legislation, it certainly does not mean, as the appellant would in effect have us believe, that we are to consider that legislation not yet passed is presumptively unconstitutional. Rather, the courts are to presume, until the contrary appears, that Congress will fulfill its obligation to defend and preserve the Constitution.

Thus the only real basis for the appellant's contention seems to be that in some way the First Amendment in protecting freedom of speech guaranties such privacy in speaking as the particular speaker may desire, and that this privacy is violated by whatever disclosure occurs incidental to an investigation for legislative purposes. This is a fallacy essentially based upon the idea that the Constitution protects timidity. Perhaps there are those who would indulge in any sort of propaganda activities covertly but not if they thought that what they did would become publicly known, and perhaps as regards them fear of disclosure is a deterrent which bolder persons would not heed. But this fear is not created by any legal restriction upon their right to conduct propaganda activities by means of speaking freely if they care to do so. They must, of course, take their chances, just as does any one else, that they keep within the bounds of lawful peaceful persuasion and refrain from activities looking toward the destruction of the Government by force. But short of that there is no restraint resulting from the gathering of information by Congress in aid of its power and duty to legislate which does not flow wholly from the fact that the speaker is unwilling to advocate openly what he would like to urge under cover. Until there is a valid law to the contrary, he may with impunity say what he pleases so far as legal process is concerned and, that is the extent of the freedom of speech guaranteed any one by the Constitution.

This leaves us with the final contention advanced in behalf of the appellant, that the statute in question has been so discriminately administered that it is unconstitutional, citing Yick Wo v. Hopkins, 118 U.S. 356, 373, 374, 6 S.Ct. 1064, 30 L.Ed. 220. The appellant is, of course, correct in arguing that, although Yick Wo v. Hopkins, supra, and similar cases are primarily concerned with the "equal protection of the laws" clause under the Fourteenth Amendment, the discriminations prohibited by that clause also violate the Fifth Amendment, where they amount to a denial of due process. See Hirabayashi v. United States, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774. The alleged discrimination here, apparently, is that while some matters have been thoroughly and diligently investigated others have not, and in support of these allegations we are cited to various acts of the committee of its predecessors and their members, many of which do not relate to this alleged "discrimination" but which, to the extent that they have occurred, cannot be and have not been condoned. See, e. g., United States v. Lovett, 328 U.S. 303, 308–313, 66 S.Ct. 1073, 90 L.Ed. 1252; Ex parte Frankfeld, D.C.D.C., 32 F.Supp. 915. But we think the discrimination argument beside the point. Certainly, if the question were one of Congress' legislating, it could validly legislate regarding one type of propaganda and not another, at least if there were a clear and present danger from the former and not the latter. Or even if there were such a danger from both, it might well be held that Congress could legislate as regards one and not the other, on the well established principle that the legislature need not strike at the whole of an evil, but only at a part. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 79, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160; Keokee Coke Co. v. Taylor, 234 U.S. 224, 227, 34 S.Ct. 856, 58 L.Ed. 1288; Minnesota ex rel. Pearson v. Probate Court of Ramsey County, 309 U.S. 270, 274, 275, 60 S.Ct. 523, 84 L.Ed. 744, 126 A.L.R. 530; Queenside Hills Realty Co. v. Saxl, 328 U.S. 80, 94, 66 S.Ct. 850, 90 L.Ed. 1096. Clearly the Congressional power to investigate is as flexible as its power to legislate, once the latter power

is established. That it is established, at least for purposes of this case, seems abundantly clear.

Judgment affirmed.

CLARK, Circuit Judge, dissents with separate opinion.

CLARK, Circuit Judge (dissenting).

I find it neither easy nor pleasant to disagree on this issue, one of the more momentous which has come before us. Despite hoary precedents, public satisfaction with judicial review of legislative acts has not been such as to invite judges to embark thereon hastily or willingly. Even in the field of civil rights, where we are admonished that the ordinary presumption in favor of constitutionality is either faint or nonexisting,[1] it is not yet clear that the courts can accomplish permanent changes in the ways of men's thinking. Yet the precedents compelling scrutiny are precise and pointed, and the presence before us of one citizen deprived of his liberty and probably of his future livelihood makes it impossible to evade judicial responsibility to serve as that "haven of refuge" which the courts must offer a dissident minority. Chambers v. Florida, 309 U.S. 227, 241, 60 S.Ct. 472, 84 L.Ed. 716. And the necessity of decision becomes all the more pressing when, as I think it obvious, no more extensive search into the hearts and minds of private citizens can be thought of or expected than that we have before us. If this is legally permissible, it can be asserted dogmatically that investigation of private opinion is not really prohibited under the Bill of Rights. In other words, there will then have been discovered a blank spot in the protective covering of that venerated document. Judges and courts, presidents and executive departments, together with all the administrative agencies, must conform; and, indeed, so must the legislature when exercising its prime function of legislating. Only when it refrains from carrying its activities to their constitutional climax will it, and it alone, be exempt from respecting the most cherished of all our democratic privileges. I cannot accept such a consequence and hence must express as best I may the reasons why I think this result is invalid.

As I have indicated, the precedents requiring judicial scrutiny of this legislative activity are beyond question; and conflict of view may arise only as to the proper outcome of the scrutiny in a particular case. The leading case is Kilbourn v. Thompson, 103 U.S. 168, 190, 26 L.Ed. 377, where the Court held invalid an investigation of a judicial nature into the possible losses of the United States on the failure of Jay Cooke & Co. and upheld an action for false imprisonment brought by a recalcitrant witness against the Sergeant-at-Arms of the House of Representatives.[2] Speaking for a unanimous court, Justice Miller in the course of an historical survey trenchantly stated that "we are sure that no person can be punished for contumacy as a witness before either House, unless his testimony is required in a matter into which that House has jurisdiction to inquire, and we feel equally sure that neither of these bodies possesses the general power of making inquiry into the private affairs of the citizen."

Later cases which have upheld investigations of official wrongdoing have quoted and followed this statement. Thus, in Sinclair v. United States, 279 U.S. 263, 291, 292, 49 S.Ct. 268, 73 L.Ed. 692, the Court, in reiterating the principle stated in McGrain v. Daugherty, 273 U.S. 135, 173, 47 S.Ct. 319, 71 L.Ed. 580, 50 A.L.R. 1, that neither House of Congress was invested with general power to inquire into private affairs and compel disclosures, but only with limited power of inquiry to carry out

---

[1] Schneider v. State of New Jersey, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155; United States v. Carolene Products Co., 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 82 L. Ed. 1234; Thomas v. Collins, 323 U.S. 516, 529, 530, 65 S.Ct. 315, 89 L.Ed. 430; Jackson, The Struggle for Judicial Supremacy, 1941, 285; 40 Col.L.Rev. 531; 51 Yale L.J. 798, 802.

[2] Mr. Kilbourn eventually recovered a large verdict, which was ordered paid by Congress. Kilbourn v. Thompson, 11 D. C. 401, 416, 432, MacArth. & M. 401; Re Pacific Ry. Commission, C.C.N.D.Cal., 32 F. 241, 253; Pepper, Family Quarrels, 1931, 157; 23 Stat. 467.

its constitutional function, went on: "And that case shows that, while the power of inquiry is an essential and appropriate auxiliary to the legislative function, it must be exerted with due regard for the rights of witnesses, and that a witness rightfully may refuse to answer where the bounds of the power are exceeded or where the questions asked are not pertinent to the matter under inquiry.

"It has always been recognized in this country, and it is well to remember, that few if any of the rights of the people guarded by fundamental law are of greater importance to their happiness and safety than the right to be exempt from all unauthorized, arbitrary or unreasonable inquiries and disclosures in respect of their personal and private affairs. In order to illustrate the purpose of the courts well to uphold the right of privacy, we quote from some of their decisions." [279 U.S. 263, 292, 49 S.Ct. 271.] And the Court then proceeded to quote from Kilbourn v. Thompson, supra, 103 U.S. 168, 26 L.Ed. 377; Re Pacific Ry. Commission, C.C.N. D.Cal., 32 F. 241, from the opinion of Mr. Justice Field at page 250; and Interstate Commerce Commission v. Brimson, 154 U. S. 447, 14 S.Ct. 1125, 38 L.Ed. 49. See also In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154; Jurney v. MacCracken, 294 U.S. 125, 55 S.Ct. 375, 79 L.Ed. 802; and particularly Marshall v. Gordon, 243 U.S. 521, 37 S.Ct. 448, 61 L.Ed. 881, L.R.A.1917 F 279, Ann.Cas.1918B, 371, reversing United States ex rel. Marshall v. Gordon, D.C.S.D.N.Y., 235 F. 422, where the Court held invalid a legislative sentence of imprisonment for contempt for the writing of a defamatory letter to a subcommittee of the House. So, too, the power and the duty of the courts to scrutinize congressional investigations, lest they transcend constitutional limitations, has been constantly assumed and reiterated by text writers.[3]

Hence the somewhat general popular assumption that the congressional power of investigation has no apparent limits is quite contrary to settled precedents. Indeed, the United States Attorney, with becoming frankness, concedes as much. We must turn therefore to the authorizing resolution and statute under which this Committee acted. It is desirable at the outset, however, to define our present problem and show its necessary limits. In a discriminating review, Constitutional Limitations on the Un-American Activities Committee, 47 Col.L.Rev. 416, 426, 429, it is said that "there are three possible constitutional objections which may be raised against the validity of an inquiry like that undertaken by the Committee on Un-American Activities: (1) Congress cannot undertake a completely unlimited inquisition in the area protected by the First Amendment. (2) The purpose of the Committee to accomplish by publicity what cannot validly be done by legislation renders the whole investigation unlawful. (3) A standard of guilt sufficiently definite to allow enforcement of the Committee's demands by penal sanctions is not established." It is clear that the writer finds the third the most serious of all. Thus, after stating the standards for the wording of a penal statute, he continues: "Logically, a similar rule should apply to enactments authorizing congressional investigations which are to be aided by a broadly worded criminal statute. It is doubtful whether the measures authorizing the Committee meet any of these standards. Viewed in this light, there are serious constitutional objections to a conviction under section 192 of any witness who refuses to answer a question put to him by the Committee."

Now the problem before us, and the only

---

[3] McGeary, The Developments of Congressional Investigative Power, 1940, 106, 114; Hamilton, The Inquisitorial Power of Congress, 23 A.B.A.J. 511; Stebbins, Limitations of the Powers of Congressional Investigating Committees, 16 A. B.A.J. 425; Dimock, Congressional Investigating Committees, Johns Hopkins Univ. Studies in Historical and Political Science, Ser. 47, No. 1, 1929, 117, 149, 153–158; Eberling, Congressional Investigations, 1928, 383; Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv.L.Rev. 153, 220; 1 Wigmore on Evidence, 3d Ed. 1940, § 4k; 8 id. § 2195; 47 Col.L. Rev. 416, discussed infra.

one at this time, is whether or not the conviction of this defendant under 2 U.S.C.A. § 192 is valid. We have not before us other aspects of the Committee's activities, involving, for example, the voluntary testimony of witnesses disparaging of others, the possible incidence of the law of libel, and so on. Questions as to these matters may await the framing of definite issues presenting them; here we should pass only upon the one issue whether or not this defendant was properly deprived of his liberty. Hence we have to consider the third grounds suggested by the writer reinforced so far as here pertinent by the question as to the First Amendment suggested by the first ground.

Now the statute itself is general, making no attempt to define pertinent inquiries of Congress. Obviously it must be filled out by the form and expression of authorization in a particular case. We turn therefore to the key words of the resolutions creating and continuing the original Committee and the statute passed last year which is the present authority for the Committee's actions. These are all in the same wording, making the adjective "un-American," without further definition, the foundation stone of all the activities. Pub.L. No. 601, 79th Cong., 2d Sess., Aug. 2, 1946 § 121(b) (1) (q), 60 Stat. 828.[4] The Committee is first authorized "to make from time to time investigations of (i) the extent, character, and objects of un-American propaganda activities in the United States." Then continue further powers discussed below; even had these been more definite (as they are not), they would not have lessened the force, or the dangerous vagueness, of this initial broad grant. All attempts to explain the meaning of the key word "un-American," either on the original creation of the Committee or on its later renewals, have been avoided or opposed. On the other hand, there has been a definite and successful intent to continue this Committee without any restriction as

to its scope, and hence, as characterized by one of its members, as "the most powerful" committee of Congress.[5]

The Sinclair case indicates that the actual construction of the authorizing resolution by a committee may have some bearing on its interpretation. But the experience of this Committee's activities now for nearly a decade is instructive in the contrary direction, that is, as showing that there are no bounds to its asserted and exerted powers. A review of these activities need not be undertaken here, since it has been done thoroughly elsewhere [6] and since the various committee reports, congressional debates, addresses and articles of members, and general publications are freely available. It has never made any secret of its strength and its intent to use that strength to the utmost. Suffice it to say here that its range of activity has covered all varieties of organizations, including the American Civil Liberties Union, the C. I. O., the National Catholic Welfare Conference, the Farmer-Labor party, the Federal Theatre Project, consumers' organizations, various publications from the magazine "Time" to the "Daily Worker," and varying forms and types of industry, of which the recent investigation of the movie industry is fresh in the public mind. While it has avoided specific definition of what it is seeking, it has repeatedly inquired as to membership in the Communist party and in other organizations which it regards as communist controlled or affected. It has claimed for itself the functions of a grand jury to focus the spotlight of publicity on those it considers subversive, in order to drive them from their jobs in private and government employment and their offices in the trade unions. It has gathered a file on over 1,000,000 persons and organizations, claimed to be a "file on every known subversive individual and organization in the United States today," and has submitted lists of allegedly subversive government employees to the Attorney

---

[4] The original resolution was H.Res. 282, 75th Cong., 3d Sess., 83 Cong.Rec. 7568, 7586, 1938. For the continuing resolutions, see 47 Col.L.Rev. 416, at 417, 418.

[5] For detailed citations see 47 Col.L.

Rev. 416 et seq.; Ogden, The Dies Committee, 2d Rev.Ed.1945, 38 et seq.; and see also United States v. Lovett, 328 U. S. 303, 308–313, 66 S.Ct. 1073, 90 L. Ed. 1252.

[6] See note 5 supra.

General for investigation. Generally speaking it has avoided the suggestion of legislation. No legislation has come from the Committee itself. Its activities, however, are considered to have led to the legislation held unconstitutional as a bill of attainder in United States v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed 1252.[7] Hence neither the legislative authority nor the actions pursuant to it suggest or permit any limitations on the investigation of the spoken or written word.

If, on the other hand, we look to contemporary thought in the matter we find a like vagueness in the adjective. Perhaps the nearest to concreteness is in the emphasis made by certain leading industrial organizations and others upon what they like to call the "American way" or the "American theory of free enterprise." It is not a strained interpretation to consider that the converse trend, strongly resisted by many of our citizens (as, of course, was their undoubted right), which led to increased governmental regulation a decade ago, could be included in the intended content of the investigation. As a matter of fact, the testimony at the recent movie investigation found the necessary un-American qualities for which the Committee was searching in films which placed bankers in an unfavorable light or talked "against the free enterprise system." [8]

Further subdivisions of Public Law 601 introduce the concepts of subversive propaganda attacking the principle of our form of government, viz., "(ii) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution." The word "subversive" here conveys no additional meaning, since that is a term completely undefined in this Act or elsewhere in our Criminal Code.[9] And the clause as to attacking the principle of our form of government, as guaranteed by our Constitution, cannot be given any specific content. The freedom of amendment permitted by our Constitution makes possible advocacy of the most extensive changes in our governmental form. It cannot be that the advocacy of amendments urging change in the relation, for example, of the Executive and Congress, the subject recently of several popular books, is subversive. In Schneiderman v. United States, 320 U.S. 118, 137, 144, 63 S.Ct. 1333, 1343, 87 L.Ed. 1796, the Supreme Court noted the provisions for constitutional change by amendment, with the many changes since 1787, and held that these "refute the idea that attachment to any particular provision or provisions is essential, or that one who advocates radical changes is necessarily not attached to the Constitution." It suggested, indeed, that if any principle was essential, it was freedom of thought. Would not a suggestion by either an American or an English scholar in the field of government that the English parliamentary system or the present program of the English Labor party contained useful object lessons for Americans come within the broad language and the broad interpretation of the authorization? After all, "subversive" means

---

[7] While it was a special committee, no bills were referred to it; since it has been made a standing committee it has originated no legislation. The second statute, cited note 9 infra, was introduced by a Committee member and the Supreme Court has attributed to its work the provisions attached to appropriations denying federal employment to members of a political party or organization advocating the overthrow of the government. See United States v. Lovett, supra, 328 U.S. 303, 308, 66 S.Ct. 1073, 90 L.Ed. 1252; 47 Col.L.Rev. 416, at 427, n. 109.

[8] See the daily papers, notably the N. Y. Times for Oct. 22–25, 1947.

[9] The title clause of the "Alien Registration Act of 1940" begins, "An Act to prohibit certain subversive activities," 54 Stat. 670; but it contains no further reference to the term. Nor does it appear at all in the later act of the same year for the registration of certain organizations carrying on political activities. 54 Stat. 1201–1204. The codifiers either thought it of little significance or were troubled by what to do with it; thus it appears, under the rubric "Same," in the title clauses of all sections of both acts in 18 U.S.C.A. §§ 9–17, but in only two in 7 F.C.A., Tit. 18, viz. §§ 11, 12. For an attempt by another committee to formulate a definition of subversive activity, see United States v. Lovett, supra, 328 U.S. 303, 311, 66 S.Ct. 1073, 90 L. Ed. 1252.

"tending to subvert," which, in turn, means "to pervert or corrupt (one) by undermining his morals, allegiance, or faith; to alienate." Webster's New International Dictionary, 2d Ed. Unabridged, 1939. But advocacy of a change in political thought is certainly an attempt to undermine the faith of the present. All of this points to and underlines the real vice of so vague and ambiguous an authority when so determinedly marshalled against minority views. It invites and justifies an attempt to enforce conformity of political thinking, to penalize the new and the original, to label as subversive or un-American the attempt to devise new approaches for the public welfare, in short to damn that very kind of initiative in experimentation which has made our democracy grow and flourish. Cf. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674.

Since this is a penal statute we are called upon to enforce, standards so vague and doubtful should be adjudged insufficient under the settled requirements that prohibited conduct must for criminal purposes be set forth with clarity, so that the person to whom it applies may determine what conduct is legal and what is not. This has been often applied in the ordinary criminal law, as in United States v. L. Cohen Grocery Co., 255 U.S. 81, 89, 41 S.Ct. 298, 85 L.Ed. 516, 14 A.L.R. 1045, and more recently in M. Kraus & Bros. v. United States, 327 U.S. 614, 621, 66 S.Ct. 705, 90 L.Ed. 894, holding too indefinite a Maximum Price Regulation of the Price Administrator under which criminal prosecutions had been undertaken. "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888.

But we may pass beyond this defect to face the major issue whether or not an authorization so broad is compatible with the First Amendment. I think we can say without reservation of any kind that, had legislation been actually formulated in the exact terms of the authorization quoted, its unconstitutionality would have been conceded. As has been often pointed out, that Amendment, in securing freedom of speech against any abridgment by the Congress, does not authorize a partial lessening of the freedom or anything less than complete protection. True, in the well-known formula devised by Mr. Justice Holmes in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470, the Congress has a right to protect the safety of the state when that is endangered; and hence when words "are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils" against which Congress may legislate, they may be prohibited or penalized. As lately defined in Bridges v. California, 314 U.S. 252, 263, 62 S.Ct. 190, 194, 86 L.Ed. 192, 159 A.L.R. 1346, this means "that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished. * * * For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow." Now, when this country is at peace, it is hard to discern such circumstances of "clear and present danger." Indeed, the teaching of experience, after nearly three decades of a well-nigh pathological fear of "Communism," under constant investigation by Congress, Ogden, The Dies Committee, 2d Rev.Ed.1945,14-37, might suggest that there was more to be feared from the fear itself than from the supposed danger. During that period we have had two major threats to our economy, but they have come from different sources. One (domestic) was the economic crisis of the thirties; the other (foreign) was the attack by Japan and Germany. Each compelled for its meeting the adoption of measures seemingly "un-American" in the present context. Moreover, the inhibiting influence of the fear on governmental action upon both the domestic and the international fronts is quite obvious.

It is, of course, true that Congress, not the courts, has the responsibility of determining the need and extent of legislation

within constitutional limits. And since it may forbid propaganda of dangerous proportions when it chooses, it obviously may investigate the need of such prohibition. But when it attacks not merely dangerous propaganda, but in effect all argumentation departing from the then norm, there is no justification for the wide reaches of its claim of authority. In truth, it seems not a matter of great difficulty to provide for an investigation of proper scope which would impress all as being constitutionally justified. For Congress has already been able to translate the constitutional formula into an adequate working tool of protection, as needed. In the Alien Registration Act of 1940, 18 U.S.C.A. § 10, it has defined the crime there legislated against in terms of knowing or willful advocacy of "the duty, necessity, desirability, or propriety of overthrowing or destroying any government in the United States by force or violence, or by the assassination of any officer of any such government." Such a formula, held constitutional in Dunne v. United States, 8 Cir., 138 F.2d 137, certiorari denied 320 U.S. 790, 64 S.Ct. 205, 88 L.Ed. 476, could be easily made the appropriate yardstick of justified investigation into the evil reaches of treasonable propaganda.

It is contended, however, that the scope of the investigation is not to be defined in the same manner as the resulting legislation. But it is hard to see how the scope of the investigation can be broadened beyond the point of any possible valid legislation. An argument much stressed is that, since there is an area of legal activity for the Committee within the constitutional limitations, therefore the investigation as a whole is to be supported, and only illegal activities rejected. Passing the practical impossibility of then isolating anything as beyond the permitted investigatory scope, such a view is logically indefensible in the light of constitutional principles. Of course it is only the *going beyond* the constitutional limitation which ever renders legislative acts improper. True, one can say that the question is, as so generally, one

of degree. But the *excess* is the important question here. The fact that a bucket of water may be life-giving to a man dying of thirst does not render foolish the attempt to curb the excesses of a raging torrent. Under this argument Congress might properly pillory a person for refusing to advocate the nationalization of private property generally because it has power to regulate private property, provided it does so with due process of law, or take it upon the award of just compensation. A doctrine that the lesser legislative power always justifies the exercise of the greater investigative power, including control over opinion, will lead to strange analogies indeed!

Moreover, we must face the practical consequence of such a theory. Clearly it makes the power to investigate limitless. Since there is always an area of permissible activity to the legislature, for, indeed, its function is to legislate at large for the public good, the dram of good must always sanctify the dubious remainder. With such a thesis the power of suggesting constitutional amendments of unlimited scope could also be utilized to justify any sort of investigation—a thesis interestingly enough expressly rejected by an Australian chief justice. Colonial Sugar Refining Co. v. Attorney-General, 15 C.L.R. 182, 194, 195. And his decision was carried further on appeal, in Attorney-General v. Colonial Sugar Refining Co., [1914] A.C. 237, 252, 257, to the conclusion that, by reason of the excess of power, the entire grant to the legislative commission was invalid.

A corollary of this argument, one much pressed, is that only specific questions can be objected to by a witness before the Committee and that in cases such as the present, where the witness has not been sworn, he has no redress. But this, it is believed, is to confuse the issue before us here. We need to keep in mind the character of objections available at the examination proper. They will include personal privileges, such as that against self-crimination, in whatever attenuated form they still exist in legislative investigations,[10] and the per-

---

10 The privilege against self-crimination, if claimed, is intended by 2 U.S.C. A. § 193; 28 U.S.C.A. § 634, not to excuse testifying, but only to prevent use of the testimony for later criminal prosecution. For the problems raised by these statutes and the easy waiver of the privilege, see United States v. De

tinency of the question to "the question under inquiry." 2 U.S.C.A. § 192. But if the investigation is as broad as thus assumed, there is no logical or rational way of determining that the question is not pertinent to "the question under inquiry." How can it be said that even the stark question, "Are you a Communist?" is not pertinent to an inquiry into un-American propaganda when the latter may be defined as broadly as it has been in actual Committee experience? The real objection is very clearly to the assumed scope of the investigation. Cf. Attorney-General v. Colonial Sugar Refining Co., supra. That is a question of initial power, which should properly be raised at the outset of any inquiry by the person at whom it is directed. Logically he assumes the validity of the investigation if he starts to testify. Indeed, practically and legally there is a real question, under the extremely broad view of waiver developed with respect to appearances before congressional committees, whether he may not have waived any objection of validity by thus proceeding. See United States v. De Lorenzo, 2 Cir., 151 F.2d 122. But even if so strict rules may not be applied, there seems nothing gained in any practical sense by a requirement that a witness must be sworn and give his name and address before he can resist the unconstitutional breadth of the investigation. Such a procedural formality has no reality in the context of the broad scope of the First Amendment.

Moreover, emphasis on this point of procedure belittles, as well as nullifies, the constitutional objection. Under our scheme of legal values constitutional issues must always be raised, if at all, by some persons affected thereby. They cannot be considered and determined in vacuo. Nevertheless where those issues are of vast importance they should be considered in the light of their broad significance, and not wholly in the narrow concept of the single individual who presents them as a kind of vicarious avenger for the public weal. When we concentrate our gaze solely upon the refusal to testify as to party affiliations, it is hard for us to feel very sympathetic with the refuser. The general feeling that one should stand up and show his true colors, particularly when, as here, the inquiry is given a strong patriotic tinge, has led naturally to the public confusion which mingles strong condemnation of Committee procedures with some belief in its assumed objective. This quite normal reaction that a Communist, as well as any one else, should say what he is when the fact is of importance to the public good could be allowed its natural scope if, first, however, the investigating authority is properly limited to constitutional objectives. Indeed, given a search directed against propaganda for the overthrow of the government by force or violence, it would seem perfectly fitting as a matter of detailed examination—to test a witness' denial of illegal activities— to inquire whether or not the person investigated was a member of any organization that advocated such principles.[11] Hence, whenever the initial validity of the investigation is properly set forth, the investigation can then proceed in a workmanlike way to accomplish its express purpose, subject only to specific problems as to the pertinency of particular questions and the conduct of the hearings, with particular reference to the procedural safeguards to be accorded the individuals under investigation.[12]

---

Lorenzo, 2 Cir., 151 F.2d 122; and compare Eberling, Congressional Investigations, 1928, 287, 288, 339, 389, 390, questioning their validity. The plea of privileged communications between lawyer and client seems not to have been sustained in the proceedings before Congress which led to Jurney v. MacCracken, 294 U.S. 125, 55 S.Ct. 375, 79 L.Ed. 802. See Seabury, The Legislative Investigating Committee, 33 Col.L.Rev. 1–3.

[11] In Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, the majority over vigorous dissent held the evidence insufficient to show that in 1927 the Communist party was advocating the overthrow of the government by force and violence. See also Bridges v. Wixon, 326 U.S. 135, 65 S. Ct. 1443, 89 L.Ed. 2103.

[12] Discussion of procedural safeguards to persons investigated—not pertinent to our present issue—would include such matters as the justification of finding "guilt by association," cf. De Jonge v. Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278; Schneiderman v. United States, supra, 320 U.S. 118, 154, 63 S.

I have not dwelt upon the question whether the Committee's activities, being in form directed only to investigation of words and acts after they have taken place, can nevertheless be considered an abridgment of the freedom of speech. For it is too well established now for question that our Constitution does not follow the earlier English view of penalties after the event for such curtailment, but does prohibit any acts tending to prevent persons from exercising that broadly important right. Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; Bridges v. California, supra. Here there can be no doubt of that intended and actual consequence of the investigation. The Committee announces its desire that the persons it finds guilty shall forfeit their jobs in public and private industry and shall be subject to prosecution for any collateral crimes which may have been disclosed, and generally shall be exposed pitilessly to public condemnation. That it is successful in its purpose the daily papers show. There can be no doubt of the obvious and direct abridgment of the right freely to speak and express one's opinions which is thus achieved.

The right of congressional investigation has been so important, so productive of good in so many instances in our history, that no one would wish to hamper it improperly. And it is true, as many urge, that the force of public opinion and the ex-pression of the electorate at the polls must remain its main source of control. But in the narrow, though important, field of constitutional liberties, more control is desirable. For the extreme power thus wielded carries the seeds of its own ruin if it is not constitutionally exercised. Indeed the mixed and confused public reaction to the activities of this Committee signifies as much. Any investigation involving the freedom of expression of views or beliefs is sure to be disturbing to our historical conceptions of democracy unless it is conducted to such ends and in such manner as to command the support of public opinion. Yet the Committee has been under constant and searching criticism from even the most conservative elements in our society, who can in no sense be guilty of "red" tendencies; while even those who support its objectives do so in general with more than an apology for its methods. Such a situation, even if legally invulnerable, is a potent source of weakness, preventive of any long-range accomplishment. Friends and supporters of the congressional power may well fear its present exercise here and find the application of a proper restraint a source of strength in the long run, rather than the reverse. For a widespread belief that the Committee is acting in an un-American way to even an American end will destroy the Committee's usefulness in the eyes of "a liberty-loving people."

I would reverse for dismissal of the indictment.

---

Ct. 1333, 87 L.Ed. 1796; Bridges v. Wixon, supra, 326 U.S. 135, 147, 163, 65 S.Ct. 1443, 89 L.Ed. 2103, the protection of counsel, the presentation of written statements by witnesses, the right of cross-examination, and so on. Dimock, Congressional Investigating Committees, Johns Hopkins Univ. Studies in Historical and Political Science, Ser. 47, No. 1, 1929, "Ex Parte Inquisition," 161–163; McGeary, The Developments of Congressional Investigative Power, 1940; Rifkind, J., charge to Grand Jury, Oct. 7, 1947, N.Y.Times, Oct. 8, 1947, p. 20; Report of the President's Committee on Civil Rights, "To Secure These Rights," 1947, 165; Pub.L.No.601, 79th Cong., 2d Sess., Aug. 2, 1946, § 133(e).