UNITED STATES ex rel. MARSHALL v. GORDON, Serjeant at Arms of House of Representatives.

(District Court, S. D. New York. July 19, 1916.)

1. UNITED STATES ⬯23—HOUSE OF REPRESENTATIVES—POWERS OF—IMPEACHMENT PROCEEDINGS.

A subcommittee of the House of Representatives, acting under a resolution for the impeachment of a United States district attorney, is acting within constitutional limits when it investigates the attorney's acts.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 15; Dec. Dig. ⬯23.]

2. UNITED STATES ⬯21—CONGRESS—HOUSE OF REPRESENTATIVES—CONTEMPT.

While the House of Representatives has not the power of the English House of Commons of punishing contempts, yet it may punish a federal district attorney for insulting language or contumacious conduct directed

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

towards a subcommittee of the House investigating a resolution for his impeachment.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 13; Dec. Dig. ☞21.]

3. UNITED STATES ☞21—CONGRESS—HOUSE OF REPRESENTATIVES—POWERS OF.

As the House of Representatives, in preferring charges for impeachment, is acting in a judicial capacity, the courts will not interfere with its act in punishing one for contempt on the ground that his insulting charges or contumacious conduct impeded the investigation of a resolution for impeachment.

[Ed. Note.—For other cases, see United States, Cent. Dig. § 13; Dec. Dig. ☞21.]

Application by the United States of America, on the relation of H. Snowden Marshall, for writ of habeas corpus against Robert B. Gordon, Serjeant at Arms of the House of Representatives. Writ dismissed, and relator remanded.

This is a writ of habeas corpus, sued out by the relator to relieve him from an arrest made by the respondent, the serjeant at arms of the House of Representatives. The relator was arrested on June 26, 1916, and is still in custody. The respondent justifies in his return by virtue of a warrant issued by the Speaker of the House, under the seal of the House, attested by the clerk, on the 22d day of June, 1916. This warrant recited a resolution of the House on June 20, 1916, directing the Speaker to issue his warrant, directed to the serjeant at arms to take the relator in custody and bring him to the bar of the House to answer the charge that on March 4, 1916, he violated the privileges of the House by writing and publishing a letter. The letter in question was incorporated into the resolution and is as follows:

"Department of Justice, United States Attorney's Office.

"New York, March 4, 1916.

"Sir: Yesterday afternoon, as I am informed, your honorable committee ordered the arrest of Mr. L. R. Holme, a representative of a newspaper which had published an article at which you took offense. The unfortunate gentleman of the press was placed in custody under your orders. He was taken to the United States marshal to be placed in confinement (I do not understand whether his sentence was to be one day or a dozen years). The marshal very properly declined to receive the prisoner. This left you at a loss, and I am advised that you tried to work your way out of the awkward situation by having Mr. Holme brought back and telling him that you were disposed to be 'kind' to him and then discharged him for the purpose of avoiding unpleasant consequences to yourselves.

"You are exploiting charges against me of oppressive conduct toward a member of your honorable body who is charged with a violation of law and of oppressive conduct on my part toward shysters in the blackmailing and bankruptcy business.

"I may be able to lighten your labors by offering to resign if you can indicate anything I ever did that remotely approximates the lawless tyranny of your order of arrest of Mr. Holme.

"The supposed justification of your order that Mr. Holme be placed in custody was his refusal to answer the question you asked as to where he got the information on which was based the article which displeased you.

"It is not necessary for you to place any one under arrest in order to get the answers to the question which you asked Mr. Holme, because I can and will answer it. I gave Mr. Holme information, part of which he published and from which he made deductions, so that, if your honorable committee has a grievance, it is against me, and not against him.

"What I told him was about as follows:

"I said that your expedition to this town was not an investigation conducted in good faith, but was a deliberate effort to intimidate any district attorney

who had the temerity to present charges against one of your honorable body.

"I said that your whole proceeding here was irregular and extraordinary; that I had never heard of such conduct of an impeachment proceeding; that charges of this sort were not usually heard in public until the House of Representatives had considered them and were willing to stand back of them.

"I pointed out to him that you, contrary to the usual practice, had come here and had held public hearings; that among your witnesses you had invited every rogue that you could lay your hands on to come before you and blackguard and slander me and my assistants under the full privilege of testifying before a congressional committee.

"I told him that you had called one of my junior assistants before you and had attempted to make it publicly appear that his refusal to answer your questions as to what occurred in the grand jury room in the Buchanan case was due solely to my orders. I said that at the time you attempted to convey this public impression you knew that it was misleading, because I had been asked by you to produce the minutes of the grand jury and had been instructed by the Attorney General not to comply with your request, as you well knew. I showed him the telegram of the Attorney General to me, and showed him a copy of my letter to you, dated February 29, 1916, in which I sent you a copy of the telegram of the Attorney General instructing me not to give you the grand jury minutes.

"I told him that you were traveling around in your alleged investigation of me with Buchanan's counsel, Walsh and David Slade, in constant conference with you. I said that I believed that every word of the evidence, whether in so-called secret sessions or not, had been placed at the disposal of these worthies, and that I would be just as willing to give the grand jury minutes to a defendant as to give them to your honorable subcommittee.

"I told him that I did not share the views which seemed to prevail in your subcommittee on this subject. I said that I regarded a member of Congress who would take money for an unlawful purpose from any foreign agent as a traitor, and that it was a great pity that such a person could only be indicted under the Sherman Law, which carried only one year in jail as punishment.

"I said that it was incomprehensible to me how your honorable subcommittee should rush to the assistance of an indicted defendant—how you had apparently resolved to prevent prosecution by causing the district attorney in charge to be publicly slandered.

"I told him that I would not permit the prosecution of the persons whose cause you had apparently espoused to be impeded by you. I said that, if you wanted the minutes of the grand jury in any case, you would not get them as long as I remained in office.

"You will observe from the foregoing statement that what Mr. Holme published may have been based on what I said. If you have any quarrel, it is with me, and not with him.

"It is amazing to me to think that you supposed that I did not understand what you have been attempting to do during your visit here. I realized that your effort was to ruin me and my office by publishing with your full approval the complaints of various persons who have run afoul of the criminal law under my administration. Your subcommittee has endeavored, by insulting questions to my assistants and others, by giving publicity and countenance to the charges of rascals, and by refusing to listen to the truth and refusing to examine public records to which your attention was directed, to publicly disgrace me and my office.

"I propose to make this letter public.

"Respectfully, [Signed] H. Snowden Marshall, United States Attorney.
"Hon. C. C. Carlin,
    "Chairman Subcommittee of the Judiciary
        "Committee of the House of Representatives,
            "323 Federal Building, New York, N. Y."

The resolution further went on to find that in writing and publishing the letter the relator was guilty of a contempt of the House of Representatives, and that when brought to the bar the Speaker should cause to be read to him

the findings of fact and law of the special committee of the House charged with the duty of investigating into the contempt and that the relator should at that time be heard. The return then stated the circumstances, as follows:

On the 14th day of December, 1915, one Frank Buchanan, a member of the House, preferred charges against the relator herein of the commission of certain high crimes and misdemeanors. On the 28th day of December a grand jury in the Southern district of New York, which had been in deliberation at the time the said Buchanan made his charges, brought in an indictment against the said Buchanan and others, charging them with a violation of the provisions of the Sherman Anti-Trust law. On the 12th day of January, 1916, the said Buchanan submitted a resolution to the House that the committee on judiciary be directed to inquire into the alleged misconduct of the relator in certain particulars, authorizing the committee to send for persons and papers, to take testimony, etc., in pursuance of such inquiry. This resolution was referred to the committee on the judiciary, which proceeded to act upon it. Thereafter, on the 27th day of January, 1916, the chairman of the judiciary committee offered a resolution in the House that said committee be authorized to appoint a special committee to act on behalf of the whole committee to take testimony, with the same powers respecting testimony as the committee at large. This resolution of January 27, 1916, was passed by the House and on the 1st day of February, 1916, the chairman of the judiciary committee appointed three members, constituting a subcommittee, to investigate said charges.

The subcommittee, when organized, heard the testimony of certain witnesses, and determined to take testimony of other witnesses in the city of New York, which they did, among them one Leonard R. Holme, a reporter, who, on being questioned about a certain statement derogatory to the committee, published in a newspaper and emanating from him, declined to answer as to the sources of his supposed information. On the 4th day of March, 1916, the relator wrote the letter heretofore set forth and delivered it to the chairman of the subcommittee. Shortly thereafter on the same day he delivered it to the newspapers in the city of New York, wherein it obtained a large and wide circulation, not only in that city, but in the District of Columbia and other parts of the United States. The House took action upon this letter on the 5th day of April, 1916, by a resolution appointing a select committee of five to consider the conduct of the relator in writing and publishing the letter. This committee invited the relator to appear before them at the Capitol in Washington, which he did, at which time he admitted that he wrote the letter and stated that all of it was true, and that under the same circumstances he would write it again. The committee reported to the House that in their judgment the letter as a whole and in detail was defamatory and insulting, and that the relator had been guilty of a contempt of the House in publishing it, whereupon the resolution of June 20th, heretofore stated, was passed and the warrant issued as aforesaid.

The report of the select committee to investigate the contempt, which was made to the House on April 14, 1916, is annexed to the return. It contains its findings of fact as already stated, and also the consideration of the law and facts, including a review of the authorities. The relator does not traverse the return.

John C. Spooner and Charles P. Spooner, both of New York City, for petitioner.

D. Cady Herrick, Martin W. Littleton, and Henry M. Goldfogle, all of New York City, for respondent.

LEARNED HAND, District Judge (after stating the facts as above). **[1-3]** It was early settled that a commitment by the House of Commons for a contempt and breach of privilege was not examinable by any court. Reg. v. Paty, 2 Ld. Ray. 1105; Alexander Murray's Cases, 1 Wils. 299; Brass Crosby's Case, 3 Wils. 188; Rex v. Hob-

house, 2 Chit. Rep. 207; Burdett v. Abbott, 14 East, 1; Case of the Sheriff of Middlesex, 11 Ad. & E. 273. These cases came up in two ways, either by action of trespass against the serjeant at arms, as Burdett v. Abbott, supra, or more generally by habeas corpus, either after judgment, as Brass Crosby's Case, or after arrest, as Reg. v. Paty, supra, Alexander Murray's Case, supra, and the Case of the Sheriff of Middlesex, supra. It was even unnecessary to state, so high did the Commons carry their prerogative, the grounds of the commitment. Reg. v. Paty, supra, page 1106, per Gould, J. Indeed, the contempt in that case was for precisely the same act which the House of Lords had declared to be legal in Ashby v. White, 2 Ld. Raym. 938. Perhaps the strongest assertion of the immunity of the Commons in their judgments for contempt is to be found in the litigation of which the great case of Stockdale v. Hansard, 9 Ad. & E. 1, was the beginning. There the Queen's Bench decided that a resolution of the Commons directing Hansard, their printer, to distribute generally their proceedings, would not protect him in an action of libel. The question was argued and considered at great length, in the judgments of all the judges, how far the resolution of the House of Commons was beyond their scrutiny, and whether their prerogative was exempt from judicial control. After judgment the Commons did not appeal, and the sheriff levied and collected from Hansard, but had not paid over to the plaintiff, when the Commons issued a warrant for the Sheriff of Middlesex as for a contempt in making the levy, and committed both gentlemen to the Tower. The unhappy sheriff applied to the court thereupon for habeas corpus, to which the lieutenant of the Tower returned that he held them by warrant of the Speaker for contempt and a breach of privilege. He set out the warrant, which did not specify the nature of the contempt, and after full consideration the same court, with one exception, that decided Stockdale v. Hansard, supra, remanded the prisoners to the Tower. Case of the Sheriff of Middlesex, supra. Certainly the prerogative of the House had been vindicated.

The grounds repeatedly given for this immunity from control are that the House is a court, and a high court, with whose judgments no other court can interfere. At times the prerogative is merely put upon the traditional custom of the House—"lex et consuetudo Parliamenti." Some judges, as De Grey, C. J., in Brass Crosby's Case, supra, went so far as to say generally that the Commons were a final judge of all their prerogative; a dictum clearly overruled in Stockdale v. Hansard, supra. I do not, however, understand the language, which rests the power of the House of Commons in contempt, to indicate that they need be in the discharge of a judicial duty when the contumacious act occurs. The passages in Mr. Justice Miller's opinion in Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377, which refer to this language, are not to be so understood. It is rather that in the exercise of their power to punish for contempt they act as a court, and as such cannot be reviewed by another court. In none of the cases does it appear that the House was engaged in judicial duties, except perhaps

in Reg. v. Paty, supra. The right of the House to be so regarded itself rests upon immemorial custom.

That the power to punish for contempt is not inherent, according to English notions, in any legislative assembly, is, however, shown by the treatment of contempts of provincial assemblies by the Privy Council. At first it seems to have been supposed that they had such powers. An editor in the island of Jamaica published matter which was held by the Assembly to be a "breach of privilege"—just what does not appear. For this he was committed by that body, and afterwards sued the serjeant at arms and the Speaker. Baron Parke, who delivered the judgment upon appeal (Beaumont v. Barrett, 1 Moo. P. C. 59), rested the power, which the court upheld, upon the inherent right of all legislative assemblies to protect themselves, not only against direct impediments to the exercise of their duties, but against libels reflecting upon their authority. This decision was overruled, however, in Kielly v. Carson, 4 Moo. P. C. 63, where Baron Parke also delivered the judgment of the court. In that case Kielly had threatened a member of the Newfoundland House of Assembly outside the meeting place itself. When brought before the House he repeated his contumelious conduct, and indeed seems to have redoubled it. He was committed, and he sued in trespass on his release. Baron Parke excluded from consideration so much of the contempt as occurred before the House, because the justification was in bar, and, if the original arrest was illegal, it was no bar. He thought that such an assembly had the power to protect themselves against impediments to their proceedings, but not to punish past misconduct. This decision was followed in Fenton v. Hampton, 11 Moo. P. C. 347, where the Supreme Legislative Assembly of Van Diemen's Land had committed for contempt a witness who refused to testify at an inquiry, instituted, apparently with full authority, by that body. It was also followed in Doyle v. Falconer, L. R. 1 P. C. 328, where the Assembly of the island of Dominica had committed a member for abusive language before the House directed to the Speaker. The right of a provincial assembly to protect itself from "direct impediment" would seem, therefore, to go hardly further than to remove the offender.

The first case in this country appears to be Anderson v. Dunn, 6 Wheat. 204, 5 L. Ed. 242, where in an action of trespass against the serjeant at arms of the House of Representatives the Supreme Court held good a plea in bar justifying under the warrant of the Speaker directing the arrest of the plaintiff generally for a breach of privilege of the House and for a contempt of its dignity and authority. The plea recited that the imprisonment under the warrant continued till the House had concluded its inquiry and had found the plaintiff guilty, after which he was reprimanded and discharged. The plea did not show the nature of the contempt, and the decision is open to several possible explanations, one of which may be that since the House had the power of a court to punish for some contempts, and in so doing acted judicially, no other court could examine the judgment. If so, it is certainly overruled by Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377. In that case, however, the plea stated the

nature of the contempt, and possibly Anderson v. Dunn is to be therefore distinguished, as indicated on page 229 of the opinion in 6 Wheat. (5 L. Ed. 242), upon the theory that the plea was consistent with a contempt in the presence of the House. Whether the plea ought not to have been invalid, unless it alleged a good defense under all the possible cases covered by its broad language, is a question of pleading which is, with deference, extremely doubtful, but nevertheless that may have been the basis of the decision. In any case the power, however broad, was sustained upon its inherent necessity to protect the House in the exercise of its duties. I do not regard it as deciding more than that there are some cases in which such a power exists.

Ex parte Nugent, Fed. Cas. No. 10,375, was a case of habeas corpus to release the relator under the following circumstances: The Senate was deliberating upon a treaty in secret session, and some one unknown disclosed certain particulars to the relator, a reporter for the New York Herald. The reporter was summoned before the bar of the Senate, was sworn, and refused to answer certain questions relevant to the discovery of the person from whom he got his information. For this he was committed to the serjeant at arms until further order. The court, the Circuit Court of the District of Columbia in banc, held that the commitment of the Senate was not reviewable by a court, in analogy with the practises of the Houses of Parliament, but that, if it were, at least it appeared that the Senate was acting in a matter over which it had full powers, and that the inquiry and contempt as a means of effecting the inquiry were incidents to the discharge of its constitutional powers.

Kilbourn v. Thompson, 103 U. S. 168, 26 L. Ed. 377, was an action of trespass against the serjeant at arms, the Speaker, and several members of the House of Representatives. The House had instituted an inquiry into the existence of a "real estate pool" which it thought to be connected with a debt due the United States. The debtor, Jay Cooke & Co., had become bankrupt, and its trustee had effected a settlement of its affairs. The House passed a resolution appointing a committee to inquire into the settlement in question and into the relation of the "pool" with the debtor's property. The committee summoned the plaintiff before them and asked him the names of the "pool" members and to produce certain records. He refused, and was committed to the serjeant at arms, who held him for about six weeks, and then delivered him to the marshal of the District Court. These facts being set up in bar, the plaintiff demurred. The Supreme Court sustained the demurrer in an opinion by Mr. Justice Miller.

The exact scope of the decision is no more than to hold that the House's commitment was not conclusive upon the court, at least until it appeared that the House was engaged upon an inquiry within its constitutional powers, and that the inquiry in question was not such. In the discussion it was said that the privileges of the House were not to be gathered in any way from English parliamentary precedents, which depended upon the customs of the several houses, and especially upon the fact, recited in many of the opinions of English judges, that the House of Commons, as well as the House of Lords, was a court,

and as such enjoyed the immunity from review of its proceedings by another court which was always accorded to judicial proceedings.

The question whether the House of Representatives had any powers to commit as for a contempt in the exercise of its legislative duties was expressly reserved from consideration (103 U. S. 189, 26 L. Ed. 377); but it was thought (103 U. S. 190, 26 L. Ed. 377) that in proceedings for impeachment either House would have the same powers as a court in relation to the production of testimony, and perhaps, also, if engaged in a contested election of its members, as to which it was given full judicial powers. That the court supposed the action of the House in preferring articles of impeachment, including the preliminary inquiry for that purpose, to be judicial in its character, seems to me clearly indicated in the opinion. 103 U. S. 184, 190, 191, 26 L. Ed. 377. This ought perhaps to foreclose any further discussion; but, as the language was certainly obiter, I shall discuss the question later.

In Interstate Commerce Commission v. Brimson, 154 U. S. 447, 485, 155 U. S. 3, 14 Sup. Ct. 1125, 15 Sup. Ct. 19, 38 L. Ed. 1047, 39 L. Ed. 49, the court obiter likewise said that the powers of Congress to impose a fine and imprisonment were confined to the exercise by either House of its right to punish disorderly behavior of its members and to procure testimony in election and impeachment cases and in cases which might involve the existence of the Houses themselves. In Re Chapman, 166 U. S. 661, it was said obiter, on pages 671 and 672, 17 Sup. Ct. 677, 41 L. Ed. 1154, that both Houses had the unquestioned right to treat as a contempt a refusal to answer proper questions put to a witness in a constitutional inquiry instituted by them.

The state of the law, so far as decided, therefore, seems to be only this: That the House of Representatives has not inherited the prerogative in matters of contempt of the House of Commons, and that its commitments are open to inquiry, at least to the extent of discovering whether the commitment was an incident to the exercise of some constitutional power. Nevertheless it has a limited power to commit, and in the exercise of that power it enjoys immunity from review by a court which necessarily has no appellate jurisdiction. The last statement is certainly the law, if any part of Anderson v. Dunn, supra, survives, which I think it does. The question in this case, therefore, is of first impression in spite of all the decisions which have been cited. It turns, I think, upon three considerations: First, whether the House was engaged upon a constitutional duty; second, whether in that duty it had any powers to punish for contempt; third, whether that power went beyond compulsion to produce testimony, and included the power to punish contumacious language directed against itself, and published while the matter was still under consideration.

That the House was in fact engaged in a constitutional inquiry admits of no doubt. The resolution submitted to the judiciary committee was aimed at the impeachment of the relator, and the subcommittee was charged with duties ancillary to that inquiry. Of course, the manner of the discharge of those duties by the subcommittee is not relevant to the case now at bar, so long as they assumed to be acting under the resolution. It was faintly suggested on the argu-

ment that contumelious language directed towards the subcommittee was different from that directed to the House as a whole; but I scarcely think that question deserves much discussion, and I pass it by.

The next question is whether the House has any powers of punishing contempts, and that I deem settled by the uniform expressions of the Supreme Court. It is true that, except Anderson v. Dunn, supra, there has been no decision upon that question; but the power has always been presupposed in all the discussions, and the question throughout has concerned its limitations. Therefore it would altogether misconceive the effect of those decisions to take them as going so far as Fenton v. Hampton, supra, or Doyle v. Falconer, supra. There may, indeed, be some question even of the power to compel the production of evidence when engaged in a purely legislative matter, though even then the reservation made in Kilbourn v. Thompson, supra, seems matched by the language in Re Chapman, supra. When engaged in an impeachment, however, there can be no question that the House has some such powers, at least for the production of evidence, unless the language is to be disregarded, even of Kilbourn v. Thompson, supra, which most straitly confined its powers.

The case at bar does not, however, concern the House's power to compel the production of evidence, but the power to protect itself against the pressure which may arise from insult, abuse, or clamor while deliberating upon the finding of articles of impeachment. It will not, I think, be questioned that at common law it was a contempt of court to assail the motives and conduct of a court, at least while the matter was pending and open. Such was early held to be the rule in federal courts. Hollingsworth v. Duane, Fed. Cas. No. 6,616; United States v. Duane, Fed. Cas. No. 14,997. And such, indeed, has been held, even after Revised Statutes, § 725, in United States v. Toledo Newspaper Co. (D. C.) 220 Fed. 458, provided the publication be calculated to obstruct the administration of justice. I should not doubt that if Revised Statutes, § 725, does not apply a court has such a power. The question here is, therefore, whether the House while so engaged has the powers of a court. Suppose, for example, that, during the trial of an impeachment in the Senate, some one should publicly threaten the members unless they decided as he thought just, and suppose such threats were spread broadcast and greatly inflamed public feeling; I should have no question of the Senate's power to inquire into the case and punish the offender. The Senate in such a case is clearly a court, and by analogy would have the common powers of a court when not legally abridged. If so, the letter of the relator, if addressed to the Senate, or to a Senator, while engaged in such a trial, would be cognizable in the same way, because the question as to how far it in fact touched the court in the exercise of its duties would be involved in the power to decide the case at all, nor would a coordinate court·undertake to determine whether the gravity of the aspersions upon the Senate was enough to affect its conduct, assuming that that is the heart of the evil.

Now there is no difference between the case supposed and that at bar, except that the House was not engaged in a trial, but in consider-

ing the preferring of articles. The relator insists that in that capacity they have none of the powers of a court, for their function is not judicial. I take it that when trying their own members for expulsion or admission, or for misconduct, there could be no doubt, unless they are not to have the common-law powers of a court; but the case at bar is not quite that. It is, indeed, unwise to attempt any rigid definition of what is executive, or legislative, or judicial. The distribution of such functions has in no country, not even our own, been by à priori rules of political dogmatism. Executives make ordinances and try and dismiss their inferiors; Legislatures determine facts from evidence and try their members; judges constantly make new rules of law with prospective validity. Yet it is true that in the main courts are concerned with the determination of existing facts, and with deciding how far they fit into existing authoritative rules.

But it by no means follows that courts must always dispose of the controversy before them; they may at times do no more than determine that a trial must go on elsewhere. A judge who hears a criminal complaint, and decides only that the defendant shall be held for trial, acts as much as a court as when later he sits with a jury, and both finally dispose of the matter. He hears the evidence, decides what it proves, and whether the facts count in law. A grand jury performs exactly the same duties as a petit jury, except that its hearing is ex parte, and it need not be so clear in its convictions. It has always been treated as a part of the court, and its presentments lay the foundation for contempts. An impeaching body is in this class; its duties require it to do what the tribunal of trial must do, though the consequences be different. It is true that it may only put the respondent to a trial; but this is not always the limit of its powers. There is, for example, in the Constitution of the state of New York (article 6, § 13) a provision which suspends an impeached judge until he is acquitted. It would be an extreme position to assert that a House whose impeachment had that result was not acting judicially, yet it would be capricious to say that if the judge was not suspended, but must only stand trial, the character of the duties is changed.

That the finding of such articles is a judicial undertaking, indeed, seems to me too clear for question. Still it does not follow that the House has the powers of a court whenever it acts judicially. As suggested by the relator, a district attorney who is examining into a proposed prosecution may be acting judicially, but he certainly has not the powers of a court. In the absence of any precedents it might, indeed, be a matter of doubt, though I confess that it would seem to me arbitrary to deny the powers customary to courts to a body of equal dignity with any court while it was acting judicially. But the case is not bare of precedents, because the presupposition in all cases is that the House, when judicially engaged, has the powers of a court. The question about which differences have arisen is only whether there can be any scrutiny of the nature of the duties upon which it is engaged. I can see no reason for curtailing the customary extent of the power to commit in the case of the House below what courts them-

selves enjoyed at common law, unless it were based upon suspicion of the possible greater abuses of such powers. That would be, of course, an inadmissible consideration, if it were true, and it is happily not justified in history. While, therefore, as I have said, there is no actual decision upon the point raised, it seems to me that there is both reason and precedent for the position that the House, while deliberating upon articles of impeachment, has jurisdiction to determine whether a publication is a contumacious assault upon its freedom of action. If so, the warrant in the case at bar was within its jurisdiction. I should have no right to express any opinion upon the letter, or whether it justifies any punitive action by the House; that lies within its own exclusive determination. It certainly touched the conduct of certain of its members in their judicial duties, and it may be judged to be of a character likely to affect them in the discharge of those duties. The questions whether the conduct of those members was such as justified the comment, and, if so, whether the dignity of the House suffers more by the punishment of a just indignation, than by a recognition of its justice, are quite without the scope of this inquiry; once the power be recognized, they are comprised in its exercise.

I am, of course, aware that the implications of such a holding are to make it possible for the House to treat as a contempt criticism of its conduct pending impeachments by the press generally. Such a power involves the possibility of abuse like every other power, especially when in the hands of one who is at once the judge and the victim. On the other hand, it must be conceded that the absence of such power puts the House at the mercy of a public pressure that may at times actually prevent a fair and impartial determination of an individual's rights. It may be better that such offenses should come before a separate tribunal, unaffected by the sting of personal insult; but there is at present no such tribunal. It has been the traditional method of the law we have inherited to trust to the magnanimity of courts to disabuse themselves of such motives. Perhaps that policy is too trustful of human nature; but I certainly have no right to assume that the House of Representatives are less capable of exercising as much self-restraint as any other official charged with kindred duties. Indeed, the public resentment which an abuse of such powers is apt to bring may well be a more effective means of control upon a popular body than upon courts whose tenure·exempts them from the immediate effects of their conduct.

Finally, it must be remembered that public criticism of courts has in any event no propriety until the case be decided. The ruling in the case at bar does not imply the right of the House to treat as a contempt statements made while legislative questions are pending before it. At such times discussion and criticism are indispensable; it is useful that the conflict of public interests, of which legislation is a legitimate resultant, should be vocal and free. Where, however, the duty is judicial, the case is quite different. In such cases a habit of public appeal breeds a state of mind in the tribunal at variance with the first duties of a judge, and any value it could have, even in ex-

treme cases, is not a counterweight to the dangers of its recognition as lawful.

In fact, however, all such matters are beside the point, if the power be fairly deducible from the existing law. This I think it is, and, if so, speculation upon its value is irrelevant.

The relator will be remanded to the custody of the serjeant at arms, and the writ dismissed.