(Slip Opinion)

# Whether Congress May Use Inherent Contempt to Punish Executive Branch Officials Who Withhold Subpoenaed Materials Based on a Presidential Assertion of Executive Privilege

Congress may not constitutionally use its inherent power of contempt to arrest, fine, or otherwise punish an Executive Branch official for complying with the President's assertion of executive privilege over materials subpoenaed by a congressional committee.

December 20, 2024

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

On May 16, 2024, the President asserted executive privilege over materials subpoenaed by the Committee on the Judiciary and the Committee on Oversight and Accountability of the U.S. House of Representatives ("Committees") and directed you not to produce them. You complied with the President's direction. A Member of the House introduced resolutions that would have held you in contempt and ordered your arrest by the House Sergeant at Arms or directed the Speaker of the House to impose daily fines of $10,000 against you until you complied with the Committees' subpoenas. *See* H.R. Res. 1205, 118th Cong. (2024); H.R. Res. 1344, 118th Cong. (2024). The resolution that would have provided for the imposition of daily fines against you was brought to the House floor but failed to pass. *See* 170 Cong. Rec. H4609 (daily ed. July 11, 2024).

As the House was considering these resolutions, you asked this Office whether it would be constitutional for the House to use its inherent contempt power to arrest or impose the proposed fines against you for complying with the President's direction not to disclose the materials over which he had asserted executive privilege. In a 1984 opinion, we concluded that the separation of powers precludes Congress from doing so, *see Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. O.L.C. 101, 140 n.42 (1984) ("*Prosecution for Contempt* "), and we have repeatedly reaffirmed that conclusion in subsequent opinions. Consistent with this longstanding view, we advised you that Congress cannot use its inherent contempt power to arrest, imprison, or otherwise punish an Executive Branch official for complying with the President's assertion of executive

1

privilege. This opinion further explains the advice we provided you when the House was considering the contempt resolutions.

## I.

On January 12, 2023, you appointed Special Counsel Robert K. Hur to investigate matters including the "possible unauthorized removal and retention of classified documents or other records" discovered at the Penn Biden Center for Diplomacy and Global Engagement and the President's private residence in Wilmington, Delaware. Att'y Gen. Order No. 5588-2023 (Jan. 12, 2023). As part of his cooperation with the Special Counsel's investigation, the President sat for a voluntary interview with the Special Counsel that lasted more than five hours. *See* Robert K. Hur, *Report on the Investigation into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* 11, 210 (2024). In addition, the Special Counsel twice interviewed the President's ghostwriter, Mark Zwonitzer. *Id.* at 342. The interviews with the President and Zwonitzer were audio-recorded at the request of the Special Counsel.

On February 27, 2024, the Committees issued subpoenas for materials related to the Special Counsel's investigation, including audio recordings of his interviews with the President and Zwonitzer. *See* Letter for Merrick B. Garland, Attorney General, from James Comer, Chairman, House Committee on Oversight and Accountability, and Jim Jordan, Chairman, House Committee on the Judiciary at 2 (Feb. 27, 2024). The Department made substantial efforts to accommodate the Committees' interest in the subpoenaed materials. For example, the Department provided Special Counsel Hur's report without any additional redactions and facilitated his appearance before the House Judiciary Committee, where he testified for more than five hours about his investigation. The Department also provided transcripts of the Special Counsel's interviews of the President and Zwonitzer, as well as classified and other documents that the Committees requested. *See* Letter for Jim Jordan, Chairman, House Committee on the Judiciary, and James Comer, Chairman, House Committee on Oversight and Accountability, from Carlos Felipe Uriarte, Assistant Attorney General, Office of Legislative Affairs at 1–2 (Apr. 8, 2024). Yet the Committees continued to pursue additional information—specifically focusing on

2

the audio recordings of the Special Counsel's interviews with the President and Zwonitzer—and scheduled votes on reports recommending that the House find you in contempt of Congress if the audio recordings were not disclosed. *See* Letter for Merrick B. Garland, Attorney General, from James Comer, Chairman, House Committee on Oversight and Accountability, and Jim Jordan, Chairman, House Committee on the Judiciary at 2, 4 (Apr. 15, 2024).

In light of the Committees' threats to initiate contempt proceedings, you requested our advice on the availability of an assertion of executive privilege in these circumstances. We advised that the subpoenaed audio recordings fell within the scope of executive privilege, that the Committees had failed to satisfy any of the potentially relevant standards for overcoming an assertion of privilege, particularly given the responsive information already provided by the Department, and that the President could thus assert executive privilege over the recordings. *Assertion of Executive Privilege Over Audio Recordings of the Special Counsel's Interviews of the President and His Ghostwriter*, 48 Op. O.L.C. __, at *1 (May 15, 2024); *see also* Memorandum for Merrick Garland, Attorney General, from Christopher Fonzone, Assistant Attorney General, Office of Legal Counsel, et al., *Re: Executive Privilege Assertion for Audio Recordings* at 1 (May 15, 2024). We also advised you that, under longstanding Executive Branch precedent, the criminal contempt of Congress statute does not apply, and could not constitutionally be applied, to Executive Branch officials who do not disclose materials to Congress based on a presidential assertion of privilege. *Id.* at 4 (citing *Prosecution for Contempt*, 8 Op. O.L.C. at 129).

On May 16, 2024, prior to the Committees' votes on the reports recommending that the House find you in contempt, the President asserted executive privilege over the audio recordings and directed you not to produce them to the Committees. We advised you that, "[a]s a result of the President's directive, you may not produce the recordings to the Committees consistent with the responsibilities of your office." Memorandum for Merrick Garland, Attorney General, from Christopher Fonzone, Assistant Attorney General, Office of Legal Counsel, et al., *Re: The President's Executive Privilege Assertion and the Criminal Contempt of Congress Statute* at 1 (May 16, 2024). You complied with the President's direction. However, notwithstanding the President's privilege assertion, and despite the Department's efforts to accommodate the

Committees' requests, the Committees adopted reports recommending that the House cite you for contempt. The House then adopted contempt resolutions on June 12, 2024, and directed the Speaker of the House to certify the reports on the resolutions to the United States Attorney for the District of Columbia for prosecution under the contempt of Congress statute, 2 U.S.C. §§ 192, 194. *See* H.R. Res. 1292, 118th Cong. (2024) (enacted); H.R. Res. 1293, 118th Cong. (2024) (enacted): *see also* H.R. Res. 1287, 118th Cong. (2024) (enacted) (providing that H.R. Res. 1293 is adopted upon the adoption of H.R. Res. 1292).

Consistent with our advice that the criminal contempt of Congress statute could not constitutionally be applied in these circumstances, the Department subsequently informed House Speaker Mike Johnson that your conduct in response to the subpoenas issued by the Committees did not constitute a crime and that the Department would not bring the matter before a grand jury or take any other action to prosecute the Attorney General. *See* Letter for Mike Johnson, Speaker, U.S. House of Representatives, from Carlos Felipe Uriarte, Assistant Attorney General, Office of Legislative Affairs at 3 (June 14, 2024).

Soon thereafter, a Member of Congress expressed an intent to force a vote on a resolution that would have held you in contempt without reference to the contempt statute and, as noted above, would have directed the House Sergeant at Arms to arrest you and bring you before the House for purported failure to comply with the Committees' subpoenas. *See* H.R. Res. 1205, 118th Cong. (2024). This Office advised you that, under well-established Executive Branch precedents, it would be unconstitutional for the House to use its inherent contempt power to arrest, imprison, or otherwise punish you for not disclosing subpoenaed materials that the President had directed you not to disclose based on his assertion of executive privilege. Memorandum for Merrick Garland, Attorney General, from Christopher Fonzone, Assistant Attorney General, Office of Legal Counsel, *Re: Whether Congress May Use Its Inherent Contempt Authority to Arrest Executive Branch Officials Who Withhold Subpoenaed Materials Based on an Assertion of Executive Privilege by the President* at 4–5 (June 24, 2024). On July 9, 2024, another resolution was introduced that, instead of ordering your arrest, would have directed the Speaker of the House to impose fines of $10,000 per day against you until you complied with the relevant subpoena. *See* H.R. Res. 1344, 118th Cong. (2024).

Again, this Office advised you that it would be unconstitutional for the House to use its inherent contempt power in this manner. Memorandum for Merrick Garland, Attorney General, from Christopher Fonzone, Assistant Attorney General, Office of Legal Counsel, *Re: Whether Congress May Use Its Inherent Contempt Authority to Fine Executive Branch Officials Who Withhold Subpoenaed Materials Based on a Presidential Assertion of Executive Privilege* at 2 (July 10, 2024).

On July 11, 2024, the full House took up but failed to pass the resolution that would have provided for the imposition of daily fines against you for purportedly failing to comply with the Committees' subpoenas. *See* 170 Cong. Rec. H4609 (daily ed. July 11, 2024).

## II.

### A.

The Constitution does not grant Congress explicit authority to hold nonmembers in contempt, but Congress has nonetheless maintained, and the Supreme Court has affirmed, that Congress has implicit constitutional authority to arrest nonmembers for acts that "obstruct the performance of the duties of the Legislature." *Jurney v. MacCracken*, 294 U.S. 125, 147–48 (1935); *see also Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204 (1821). This power stems, according to the Court, from Congress's inherent authority to preserve its constitutionally derived legislative power. *See Marshall v. Gordon*, 243 U.S. 521, 541 (1917) ("[I]n virtue of the grant of legislative authority there [is] a power implied to deal with contempt in so far as that authority [is] necessary to preserve and carry out the legislative authority given."). It also finds its roots in English and early American history. In the sixteenth century, each house of Parliament began to punish "interferences with the House's ability to do its own business." Josh Chafetz, Congress's Constitution 153, 155 (2017) ("*Congress's Constitution*"). Likewise, in the American colonies, "[t]he colonial assemblies, modeled after Parliament, also exercised the power to cite and to prosecute for contempt" for similar reasons. Carl Beck, Contempt of Congress: A Study of the Prosecutions Initiated by the Committee on Un-American Activities, 1945–1957 at 2 (1959) ("*Contempt of Congress: A Study*").

The Supreme Court has made clear, however, that there are limits to Congress's inherent contempt power. The power "rests only upon the

right of self-preservation; that is, the right to prevent acts which, in and of themselves, inherently obstruct or prevent the discharge of legislative duty." *Marshall*, 243 U.S. at 542; *see also MacCracken*, 294 U.S. at 147–48 ("[T]he scope of the power is narrow. No act is so punishable unless it is of a nature to obstruct the performance of the duties of the legislature."). Thus, in *Kilbourn v. Thompson*, 103 U.S. 168 (1880), for example, the Court held that the House had "exceeded the limit of its own authority" when it arrested the plaintiff for refusing to comply with a subpoena that a committee issued as part of an investigation into private affairs that, according to the Court, "was judicial in its character, and could only be properly and successfully made by a court of justice." *Id.* at 192–93. In any event, "even where Congress properly exercises its authority to deal with a contempt, the punishment must cease upon the adjournment of Congress." *Legal Effectiveness of Congressional Subpoenas Issued After an Adjournment* Sine Die *of Congress*, 20 Op. O.L.C. 372, 374 (1996) (citing *Anderson*, 19 U.S. at 231, and *Marshall*, 243 U.S. at 542).

## B.

The House first used its power of inherent contempt to arrest a non-member in 1795, *see* 5 Annals of Cong. 166–70 (1795),[1] and both congressional chambers prosecuted nonmembers for contempt for much of the Nation's early history, *see Congress's Constitution* at 172. Between 1795 and 1857, for instance, the House and Senate ordered the arrest of nine nonmembers pursuant to the chambers' inherent contempt powers. *See Contempt of Congress: A Study* at 191–216 (synopsis of contempt citations from 1787 to 1943).

---

[1] Although the majority of early Members of Congress accepted that the Constitution authorized the chambers to arrest and punish nonmembers, some Members questioned whether such authority existed. Among the latter group was James Madison, who was one of seventeen House Members to vote against the first resolution finding a nonmember guilty of contempt. *See* 37 Am. State Papers 132 (1795). Madison wrote in a letter to Thomas Jefferson that "it will be difficult, I believe, to deduce the privilege from the Constitution, or to limit it in practice." Letter for Thomas Jefferson from James Madison (Jan. 10, 1796), https://founders.archives.gov/documents/Madison/01-16-02-0103. He also feared that an inherent contempt power could be abused: "What an engine may such a privilege become, in the hands of a body once corrupted, for protecting its corruptions against public animadversion, under the pretext of maintaining its dignity and preserving the necessary confidence of the public!" *Id.*

Over time, however, Congress ceased using its power of inherent contempt to the point that more than 60 years ago the Supreme Court referred to the power as "practically abandoned." *Watkins v. United States*, 354 U.S. 178, 206 (1957). Multiple reasons likely contributed to this change in congressional practice, including the burdens of arresting, trying, and punishing individuals for failure to comply with congressional subpoenas and the fact that imprisonment for inherent contempt cannot extend beyond the end of the current session of Congress, limiting its effectiveness as a tool for compelling compliance. *See* Todd Garvey, Cong. Research Serv., RL34097, *Congress's Contempt Power and the Enforcement of Congressional Subpoenas: Law, History, Practice, and Procedure* at 12–13 (updated May 12, 2017) (discussing the change in practice and reasons for it); *see also Congress's Constitution* at 175 (discussing the burdens of undertaking inherent contempt proceedings); *Watkins*, 354 U.S. at 207 n.45 (highlighting the limits of inherent contempt since imprisonment by either chamber "is valid only so long as the [chamber] remains in session"). Whatever the precise causes, the results are clear: Congress has not authorized inherent contempt since 1934. *See Contempt of Congress: A Study* at 94 n.6, 212–13 (listing the 1934 arrests of William P. MacCracken and his associate, L.H. Brittin, as the most recent instances of Congress's use of its inherent contempt power). Since then, Congress has instead referred contempt citations to U.S. Attorneys under the criminal contempt of Congress statute, 2 U.S.C. §§ 192, 194, which was enacted in 1857 at least in part to address some of inherent contempt's deficiencies, *see Prosecution for Contempt*, 8 Op. O.L.C. at 129–32 (recounting the criminal contempt statute's legislative history); *Watkins*, 354 U.S. at 207 n.45.

Moreover, even during the 140 years in which Congress was employing its inherent contempt power, a House of Congress never attempted to use the authority against an Executive Branch official for refusing to produce information based on a constitutional prerogative of the Executive. Indeed, as far as we are aware, a House of Congress only twice even attempted to use the authority against an Executive Branch official, and neither of those cases involved a presidential assertion of executive privilege or other separation of powers-based defense to compliance. *See* Josh Chafetz, *Executive Branch Contempt of Congress*, 76 U. Chi. L. Rev. 1083, 1132–39 (2009).

In particular, the first attempt occurred in 1879, when the House ordered the Sergeant at Arms to arrest the U.S. Minister to China, George Seward, for contempt related to his refusal to produce certain accounting books to the House Committee on Expenditures in the State Department, which was investigating whether he should be impeached for misconduct he allegedly committed while holding the office of consul-general in Shanghai. 3 Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* § 1699, at 55–59 (1907); *see also* 8 Cong. Rec. 2138 (1879) (statement of Speaker Randall). Seward appeared before the House in the custody of the Sergeant at Arms, where he was informed that he was "under arrest on an alleged breach of the privileges of the House in refusing to answer certain questions propounded to you by a committee." 8 Cong. Rec. at 2138. Seward presented a written statement asserting that because the Committee subpoenaed the materials as part of an impeachment investigation, he had a Fifth Amendment right not to produce them. *Id.* at 2138–41. The House referred Seward's statement to the Judiciary Committee and agreed to "allow[] [Seward] to depart on his own recognizance." *Id.* at 2143–44. The Committee on Expenditures in the State Department reported articles of impeachment against Seward, but the full House did not vote on them before the legislative session ended. 3 *Hinds' Precedents* § 1699, at 59. On the last day of the session, the Judiciary Committee reported that Seward should not be compelled to incriminate himself during the pendency of impeachment proceedings. *Id.* § 1700, at 59–60. Seward was never found guilty of contempt, and he did not challenge his arrest. *See id.*; *Congress's Constitution* at 177.

The second attempt occurred in 1916. Then, the House found that H. Snowden Marshall, the U.S. Attorney for the Southern District of New York, was guilty of contempt of Congress for sending and simultaneously releasing to the press an "unparliamentary and manifestly ill-tempered" letter to a House subcommittee that was investigating him for misconduct. *Marshall*, 243 U.S. at 531. The House then issued a formal warrant for Marshall's arrest, the Sergeant at Arms executed that warrant in New York, and Marshall filed a petition for a writ of habeas corpus. *Id.* at 532. The district court denied the petition, *United States ex rel. Marshall v. Gordon*, 235 F. 422, 433 (S.D.N.Y. 1916), but the Supreme Court reversed on the theory that the House had exceeded the scope of its authority in holding Marshall in inherent contempt for conduct that did not

obstruct the House's legislative duties, *Marshall*, 243 U.S. at 546. As the Court explained, in the absence of "any obstruction to the performance of legislative duty resulting from the letter," the House could not punish Marshall for the mere "effect and operation which the . . . letter would produce upon the public mind" or "the sense of indignation" felt by Members of Congress. *Id.* at 545–46 ("[T]he contempt relied upon was not intrinsic to the right of the House to preserve the means of discharging its legislative duties.").

Thus, we are aware of only two instances, both occurring more than a century ago, in which a House of Congress even attempted to arrest an Executive Branch official. And neither of these examples involved a failure to produce materials over which the President had asserted executive privilege. Nor are we aware of Congress ever using its inherent contempt power to impose a monetary fine as punishment for contempt. *See* Todd Garvey, Cong. Research Serv., R45653, *Congressional Subpoenas: Enforcing Executive Branch Compliance* at 34 (Mar. 27, 2019) ("Neither the House nor the Senate has ever imposed a monetary penalty through the exercise of inherent contempt[.]").

## III.

As we noted at the outset, this Office recognized in 1984 that it would be unconstitutional for Congress to use its inherent contempt power to arrest, imprison, or otherwise punish an Executive Branch official who refuses to provide subpoenaed materials or testimony based on the President's assertion of executive privilege. We have repeatedly reaffirmed this view.[2] We do so again here, concluding that the House may not

---

[2] *See, e.g.*, *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 86 (1986) (explaining that our reasoning that the criminal contempt of Congress statute cannot constitutionally be applied against an Executive Branch official who withholds subpoenaed information based on a presidential assertion of privilege "applies to Congress's inherent contempt powers as well" (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 140 n.42)); Memorandum for Janet Reno, Attorney General, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Congressional Demands to Interview Prosecutors and Review Deliberative Documents in Closed Cases* at 8 (Nov. 23, 1993) (same); *Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, at *20 (May 20, 2019) (concluding that Congress cannot "lawfully exercise any inherent contempt authority" against a senior presidential aide who is entitled to

constitutionally use its inherent power of contempt to arrest or direct that daily fines of $10,000 be imposed against you for complying with the President's assertion of executive privilege over the audio recordings of Special Counsel Hur's interviews with the President and Zwonitzer.

## A.

The 1984 opinion that first articulated the basis for concluding that Congress may not use its inherent contempt power in this manner principally addressed whether the criminal contempt of Congress statute could apply in the face of an executive privilege assertion. In that opinion, we concluded that the criminal contempt statute "was not intended to apply and could not constitutionally be applied to an Executive Branch official who asserts the President's claim of executive privilege." *Prosecution for Contempt*, 8 Op. O.L.C. at 102. As we explained, the President has the authority, "rooted inextricably in the separation of powers under the Constitution," to preserve the confidentiality of certain Executive Branch information by asserting executive privilege. *Id.*; *see also United States v. Nixon*, 418 U.S. 683, 708 (1974). The application of the criminal contempt of Congress statute to an official who abides by the President's claim of executive privilege would "immeasurably burden the President's ability to assert the privilege and to carry out his constitutional functions." *Prosecution for Contempt*, 8 Op. O.L.C. at 136. Specifically, the possibility of criminal contempt would put Executive Branch officials "to the risk and burden of a criminal trial in order to vindicate the President's assertion of his constitutional privilege," and the President would thus be faced with the "untenable position of having to place a subordinate at the risk" of prosecution in order to carry out his constitutional functions. *Id*. If Congress "could use the power of criminal contempt to coerce the President either not to assert or to abandon his right to assert executive privi-

---

absolute testimonial immunity when the President has directed the aide not to appear before a congressional committee (citing *Prosecution for Contempt*, 8 Op. O.L.C. at 136); *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *2, *13–14 (May 23, 2019) (concluding that, when a congressional committee issues a subpoena for testimony that may include information protected by executive privilege, but committee rules prohibit agency counsel from accompanying the agency witness, the subpoena is "legally invalid" and cannot be enforced "by civil or criminal means or through any inherent contempt power of Congress").

lege," we observed, the privilege would be effectively "nullified." *Id.* at 138.

Our 1984 opinion further recognized that this same reasoning would apply if Congress attempted to utilize its inherent contempt powers against an Executive Branch official for complying with the President's assertion of executive privilege. *Id.* at 140 n.42. Like a prosecution under the criminal contempt statute, Congress's exercise of its inherent contempt power creates a risk of imprisonment or other potential punishment for Executive Branch officials in these circumstances. And, just as with criminal contempt, if Congress could use inherent contempt to arrest, imprison, or otherwise punish an Executive Branch official for complying with the President's assertion of executive privilege, that official would be presented with the untenable choice of risking congressional punishment or defying the President's directive. *See id.* at 136. Therefore, as in the context of criminal contempt, Congress's use of inherent contempt in this manner would drain the President's exercise of privilege of "any practical substance" and intolerably burden the exercise of the President's constitutional functions. *Id.* at 140; *see also Comm. on the Judiciary of the U.S. House of Representatives v. McGahn*, 968 F.3d 755, 776 (D.C. Cir. 2020) (en banc) ("[T]he 'contempt of Congress statute does not require and could not constitutionally require a prosecution' of an Executive Branch official who defies a congressional subpoena on the basis of Executive privilege . . . [and] detaining [a former Executive Branch official] pursuant to the House's inherent contempt authority[] is similarly impracticable." (quoting *Prosecution for Contempt*, 8 Op. O.L.C. at 142)); *Comm. on the Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 92 (D.D.C. 2008) ("[T]here are strong reasons to doubt the viability of Congress's inherent contempt authority vis-a-vis senior executive officials." (citing *Prosecution for Contempt*, 8 Op. O.L.C. at 140 n.42, and *Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 83 (1986))).

The history recounted above further supports the view that Congress may not constitutionally use its inherent contempt power to arrest, imprison, or otherwise punish an Executive Branch official for carrying out a presidential assertion of executive privilege. The Supreme Court has made clear that "longstanding practice is a consideration of great weight in

cases concerning the allocation of power between the two elected branches of Government," including—and perhaps especially—in the areas of congressional oversight and executive privilege. *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020) (cleaned up); *see also Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (placing "significant weight upon historical practice" in analyzing the balance of powers between the branches (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014))). Disputes between the Executive Branch and Congress over the latter's access to information in the possession of the former date back to the Founding—indeed, there have been numerous "highly visible battles over the subject of executive privilege" throughout our history, including during the 140 years when Congress was regularly holding nonmembers in inherent contempt. *Prosecution for Contempt*, 8 Op. O.L.C. at 131. Yet Congress has only twice even attempted to use its inherent contempt power against an Executive Branch official, and never has it done so to punish an official for failing to produce materials over which the President has asserted executive privilege. *See supra* Part II.B. This absence of relevant practice further suggests that Congress may not use inherent contempt to place an unconstitutional burden on the President's ability to preserve the confidentiality of privileged Executive Branch information.

**B.**

We readily conclude that our longstanding precedent applies to the exercises of Congress's inherent contempt authority that H.R. Res. 1205 and H.R. Res. 1344 envisioned. The President asserted executive privilege over the audio recordings subpoenaed by the Committees. The President further directed you not to produce those recordings to the Committees. You complied with that direction. And the inherent contempt resolutions in question purported to either order the House Sergeant at Arms to arrest you (H.R. Res. 1205) or direct the Speaker of the House to impose daily fines of $10,000 against you (H.R. Res. 1344) until you complied with the Committees' subpoenas. There is thus little question that, by passing H.R. Res. 1205 or H.R. Res. 1344, the House would have sought to arrest, imprison, or otherwise punish you for complying with the President's

assertion of executive privilege, which our precedents make clear Congress may not constitutionally do.[3]

To be sure, Congress may disagree with the President's privilege assertion—it would not be the first time Congress objected to the Executive Branch's withholding of information on executive privilege grounds. And just as it has on those prior occasions, Congress may continue to use the tools at its disposal to press for the disclosure of the audio recordings through "the 'hurly-burly, the give-and-take of the political process between the legislative and the executive.'" *Mazars*, 591 U.S. at 859 (quoting *Executive Privilege—Secrecy in Government: Hearings on S. 2170, S. 2378, and S. 2420 Before the Subcomm. on Intergovernmental Relations of the S. Comm. on Gov't Operations*, 94th Cong. 87 (1975) (statement of Antonin Scalia, Assistant Attorney General, Office of Legal Counsel)). Indeed, both Congress and the Executive Branch have an obligation to heed "an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation." *United States v. Am. Tel. & Tel. Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977). But what Congress cannot do is arrest, imprison, or impose burdensome financial sanctions on, an official for carrying out the President's direction not to disclose information over which the President asserted executive privilege.

## IV.

For the foregoing reasons, we concluded that the House may not constitutionally use its inherent power of contempt to arrest or direct that daily

---

[3] When we advised you on this issue earlier this year, we focused only on the specific question of whether the separation of powers precludes Congress from using its inherent contempt power to arrest, imprison, or otherwise punish an Executive Branch official for complying with the President's direction not to disclose materials over which the President asserted executive privilege. We note, however, that H.R. Res. 1205 and H.R. Res. 1344 may suffer from additional infirmities. For example, Congress has never, in any context, used its inherent contempt authority to impose fines—a fact that, standing alone, provides reason to question whether Congress has the authority to do so. Moreover, we have also observed that subjecting an Executive Branch official to imprisonment or punishment for "obeying an express Presidential order" to withhold materials over which the President asserted executive privilege could, in addition to violating the separation of powers, raise "a serious due process problem." *Prosecution for Contempt*, 8 Op. O.L.C. at 134 n.34.

fines of $10,000 be imposed against you for complying with the President's assertion of executive privilege over the audio recordings of Special Counsel Hur's interviews with the President and Zwonitzer.

CHRISTOPHER C. FONZONE
*Assistant Attorney General*
*Office of Legal Counsel*